717 So.2d 501 (1998)
Peter D. DEVONEY, Petitioner,
v.
STATE of Florida, Respondent.
No. 88574.
Supreme Court of Florida.
June 12, 1998.
Rehearing Stricken August 18, 1998.
James R. Valerino, Sanford, for Petitioner.
Robert A. Butterworth, Attorney General, and Kristen L. Davenport, Assistant Attorney General, Daytona Beach, for Respondent.
PER CURIAM.
We have for review State v. Devoney, 675 So.2d 155 (Fla. 5th DCA 1996), wherein the district court certified the following question:
Does one or more jurors' discussion, during the course of jury deliberations, of a matter adduced during the course of trial but which they were instructed to disregard constitute an overt act of misconduct that warrants a new trial?
Id. at 161. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
Peter Devoney was driving his Corvette on October 3, 1993, when he crossed the median and struck an automobile occupied by Judy Phillips and Joseph Bruno. Phillips was killed and Bruno was severely injured. Devoney was charged with and convicted of DUI manslaughter and DUI causing serious bodily injury. At trial, defense witness Kim Swetich testified that Devoney "has always been a real calm, controlled person," and that he drove very conservatively on the day of the accident, never exceeding the speed limit. On cross-examination, the prosecutor asked Swetich the following:
Q. Okay. And you're of the opinion that the defendant drives his Corvette in a careful and cautious manner?
A. Yes.
Q. Are you aware that in 1992, he had a speeding ticket for going twenty miles an hour over the posted speed?
Defense counsel objected and the trial judge gave the following curative instruction:
Ladies and gentlemen ... the question was asked of the witness if he knew that the defendant, Mr. Devoney, had a speeding ticket at some time, I forget the date. There was an objection made and I want you to know I sustained the objection. The question and whatever answer might be made, it is totally irrelevant to the case *502 and should not be considered by you in any way. I instruct you to disregard it totally. You're not to consider it in your deliberations.
Ultimately, the jury returned a guilty verdict. After the trial, the jury foreman, John Isley, who felt remorse for having found Devoney guilty, sought out defense counsel and told him that, contrary to the court's explicit instructions, jurors had discussed the speeding ticket during deliberations. Devoney moved for a new trial based on Isley's disclosure, and the trial judge heard Isley's allegations. Isley testified under oath that, in attempting to persuade him to no longer hold out for a not guilty verdict, as many as three of the other jurors pointed out that Devoney had a prior speeding ticket. He characterized one of the juror's statements as follows:
He said, well, you know, I could sort of lean toward your thinking except for the fact that, whether you like it or not, I can't forget the fact that he had a prior bad driving record. He was quoted as driving twenty miles an hour over the speed limit. Do you  if you continue to vote not guilty, do you want to turn this man loose knowing that he's got a DUI now and a prior record? Do you want to turn him loose so as to kill somebody else?
The trial judge interviewed the remaining five jurors and all of them denied any recollection of discussing the speeding ticket. However, the trial judge accepted Isley's testimony as credible and granted a new trial. In a split decision, the district court of appeal reversed the order with instructions to reinstate the verdict.
Many years ago, this Court established guidelines with respect to the propriety of inquiry into matters occurring in the jury room. We explained
[t]hat affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself, as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or game of chance or other artifice or improper manner; but that such affidavit to avoid the verdict may not be received to show any matter which does essentially inhere in the verdict itself, as that the juror did not assent to the verdict; that he misunderstood the instructions of the Court; the statements of the witnesses or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow-jurors, or mistaken in his calculations or judgment, or other matter resting alone in the juror's breast.
Marks v. State Road Dep't, 69 So.2d 771, 774-75 (Fla.1954) (quoting Wright v. Illinois & Mississippi Tel. Co., 20 Iowa 195, 210 (1866)(emphasis omitted)). In short, matters that inhere in the verdict are subjective in nature, whereas matters that are extrinsic to the verdict are objective.
The Florida Evidence Code codifies the sanctity of the jury verdict by providing that "[u]pon an inquiry into the validity of a verdict or indictment, a juror is not competent to testify as to any matter which essentially inheres in the verdict or indictment." § 90.607(2)(b), Fla. Stat. (1993).
Consistent with the foregoing rule, our courts have been vigilant in prohibiting inquiry into jury deliberations of matters necessarily arising out of the trial. In Johnson v. State, 593 So.2d 206 (Fla.1992), the defendant relied upon the deposition of the jury foreman concerning misunderstandings of the jury during their deliberations in the penalty phase of a capital case. In rejecting this claim, we said:
[T]he jury foreman was questioned about jury pollings during deliberations and the jury's understanding of the court's instructions. This testimony "essentially inheres in the verdict" as it relates what occurred in the jury room during the jury's deliberations. This Court has held that such juror testimony is inadmissible.
Id. at 210. Likewise, in Sims v. State, 444 So.2d 922, 925 (Fla.1983), we stated:
A jury's consideration of a defendant's failure to testify is not the same as considering *503 evidence outside the record, but is rather an example of its misunderstanding or not following the instructions of the court. Such misunderstanding is a matter which essentially inheres in the verdict itself.
See also Baptist Hosp. v. Maler, 579 So.2d 97 (Fla.1991) (allegation that verdict was prompted by sympathy for brain-damaged child not subject to judicial inquiry); Orange County v. Piper, 585 So.2d 1182 (Fla. 5th DCA 1991)(allegations that jury deliberations involved discussions of insurance and other matters not introduced into evidence did not warrant postverdict jury interview); Phares v. Froehlich, 582 So.2d 683 (Fla. 2d DCA 1991)(jury interview unwarranted on assertions that jury disregarded court's instructions not to consider non-record evidence).
Those cases which have permitted an attack upon a jury verdict have required allegations of an influence upon the jurors' deliberations arising from external sources. See, e.g., Russ v. State, 95 So.2d 594 (Fla.1957)(juror related personal knowledge of non-record facts to the jury); Carcasses v. Julien, 616 So.2d 486 (Fla. 3d DCA 1993)(assertion that juror received information from outside the courtroom); Sentinel Communications Co. v. Watson, 615 So.2d 768 (Fla. 5th DCA 1993) (allegations that jurors read newspapers contrary to court orders or lied about knowledge of an incident in parking lot where jury threats might have been made do not inhere in the verdict); International Union of Operating Eng'rs Local 675 v. Kinder, 573 So.2d 385 (Fla. 4th DCA 1991)(courthouse custodian urged jurors to give a large award to the plaintiff).
The federal courts have long recognized the importance of preserving the sanctity of jury deliberations. As early as 1915, the United States Supreme Court wrote:
[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.
McDonald v. Pless, 238 U.S. 264, 267-68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915).
In English common law, a blanket rule prohibited jurors from testifying to impeach their own verdict.[1] That rule was adopted in the United States, but courts carved out an exception for the situation in which an external influence affected the jury. See Note, Public Disclosures of Jury Deliberations, 96 Harv. L.Rev. 886, 887 n. 6 (1983). Today, this common law rule is codified in Federal Rule of Evidence 606(b).[2]
Federal courts also use the external/internal distinction to decide the admissibility of jurors' testimony to impeach their own verdict. *504 In Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), the defendants were convicted of several federal crimes. After the jury returned a verdict of guilty, the defendants moved for a new trial based on evidence that jurors had engaged in several illicit activities such as consuming alcohol and ingesting and selling narcotics during court recess. As proof, defendants presented an affidavit of a juror who was an eyewitness to these activities.
The district court ruled that the affidavit was inadmissible under rule 606(b). The Supreme Court affirmed, holding that the actions alleged to have occurred were not external influences on the jury and that the failure to consider the juror's testimony did not violate the defendant's Sixth Amendment right to a fair trial before an impartial and competent jury. The Court reasoned that intoxication was similar to mental incompetency which had previously been found to be an internal influence. Id. at 118, 107 S.Ct. 2739. The Court further reasoned that "drugs or alcohol voluntarily ingested by a juror seems no more an `outside influence' than a virus, poorly prepared food, or a lack of sleep." Id. at 122, 107 S.Ct. 2739.
Writing for a majority, Justice O'Connor observed the reality of the jury system when she commented:
There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time... after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror misconduct.
Tanner, 483 U.S. at 120-21, 107 S.Ct. 2739 (citation omitted). We agree with Justice O'Connor's comments.
In view of the findings of the trial judge, we must accept the testimony of John Isley as reflecting the correct version of the events occurring in the jury room. Notwithstanding, we are convinced that the discussions concerning the speeding ticket inhered in the verdict.[3] We distinguish this siutation from that proscribed in Baptist Hospital because there is no allegation here of an express agreement among the jurors to disregard their oaths and instructions.
Likewise, we do not find Powell v. Allstate Insurance Co., 652 So.2d 354 (Fla.1995), and Wilding v. State, 674 So.2d 114 (Fla.1996), to dictate a contrary result. In Powell we set aside a verdict because members of the jury had made numerous racial jokes and statements about the plaintiffs, who were black citizens of Jamaican birth. We agree with the analysis of the court below that

Powell appears to have established that a juror who spreads sentiments of racial, ethnic, religious or gender bias, fatally infects the deliberation process in a unique and especially opprobrious way and the courts will be vigilant to root it out. Powell identifies a special circumstance where the high court deemed interference necessary in order to "jealously guard our sacred trust to assure equal treatment before the law." Also, it is important that such biases are carried like germs from outside the process of the trial to infect the jury's deliberation, whereas discussions by a jury of one or more matters heard during the course of the trial, even where jurors have been instructed to "disregard" the matter discussed, is a matter internal to and inherent in the process of trial.
State v. Devoney, 675 So.2d at 158.
Wilding was a capital case in which we set aside the verdict because it became known that three of the jurors had expressed concern over their belief that the defendant had information about their personal lives. Of course, the jurors' knowledge regarding information *505 posessed by the defendant must have come from external sources. In any event, we believe that Wilding stands alone for the proposition that the risk of injustice was too great when it was determined in a capital case that the jurors feared that the defendant might be in a position to impose retribution upon them if he was ever free to do so. We recede from that portion of Wilding which says that, while the jurors' subjective beliefs inhere in the verdict, any discussion of them can become an overt act of misconduct.
Imperfect as it may be, in a free country such as ours, the jury system continues to be the finest method ever devised for the resolution of disputes. To permit jury verdicts to be impugned in the manner advocated by Devoney would sow the seeds for the destruction of that system.
We answer the certified question in the negative and approve the decision of the court below.
It is so ordered.
OVERTON, HARDING and WELLS, JJ., and GRIMES, Senior Justice, concur.
SHAW, J., dissents with an opinion, in which KOGAN, C.J., and ANSTEAD, J., concur.
SHAW, Justice, dissenting.
The scope of our review in this matter is extremely narrow  we must determine whether the trial court abused its discretion. The trial court's ruling will be sustained absent clear abuse:
A motion for a new trial is addressed to the sound judicial discretion of the trial court, and the presumption is that [it] exercised that discretion properly. And the general rule is that unless it clearly appears that the trial court abused its discretion, the action of the trial court will not be disturbed by the appellate court.
State v. Spaziano, 692 So.2d 174, 177 (Fla. 1997) (quoting Henderson v. State, 135 Fla. 548, 562, 185 So. 625, 630 (1938)). The question is not whether we would order a new trial, but rather whether "no reasonable [person] would take the view adopted by the trial court" in light of the applicable law. Huff v. State, 569 So.2d 1247, 1249 (Fla.1990).
Chapter 90, Florida Statutes (1993), codifies the sanctity of the jury verdict and provides that any inquiry into matters that "inhere in the verdict" is prohibited:
Upon an inquiry into the validity of a verdict or indictment, a juror is not competent to testify as to any matter which essentially inheres in the verdict or indictment.
§ 90.607(2)(b), Fla. Stat. (1993). This Court explained:
That affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself, as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or game of chance or other artifice or improper manner; but that such affidavit to avoid the verdict may not be received to show any matter which does essentially inhere in the verdict itself, as that the juror did not assent to the verdict; that he misunderstood the instructions of the Court; the statements of the witnesses or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow-jurors, or mistaken in his calculations or judgment, or other matter resting alone in the juror's breast.
Marks v. State Road Dept., 69 So.2d 771, 774-75 (Fla.1954) (quoting Wright v. Illinois & Miss. Tel. Co., 20 Iowa 195, 210 (1866)) (emphasis omitted). In short, matters that inhere in the verdict are subjective in nature, whereas matters that are extrinsic to the verdict are objective.[4]
*506 Subjective matters include the thought processes, impressions, opinions, and views of individual jurors, while objective matters include the non-subjective interactions of jurors, either with outside materials or persons or with one another:
Finally, our opinion in no sense should be construed as condoning any process by which jurors actually enter into an agreement to disregard the law applicable to a case. Any actual, express agreement between two or more jurors to disregard their oaths and instructions constitutes neither subjective impression nor opinion, but an overt act. It thus is subject to judicial inquiry even though that inquiry may not be expanded to ask what impressions or opinions motivated jurors to enter into the agreement in the first instance. This is true as the court below noted, whether the agreement is to decide the case by aggregation and average, by lot, by game or chance, by any other artifice or improper manner, or by a simple overt agreement to ignore the law and the court's instructions.
Maler, 579 So.2d at 100 (citations omitted). Juror impropriety is limited to objective conduct:
The distinction drawn by the cases quoted above is between overt prejudicial acts, and subjective impressions or opinions of jurors. To the extent an inquiry will elicit information about overt prejudicial acts, it is permissible; to the extent an inquiry will elicit information about subjective impressions and opinions of jurors, it may not be allowed.
Id. at 99.
The Court in Maler fashioned a three-step protocol for piercing the sanctity of the jury verdict in the face of juror misconduct. First, no juror interview is permissible "unless the moving party has made sworn factual allegations that, if true, would require a trial court to order a new trial."[5] Second, once this initial burden is met, the moving party "must establish actual juror misconduct [via] the juror interview."[6] And finally, if the moving party meets its step 2 burden, the court must order a new trial unless the opposing party can show that the misconduct was harmless.[7] Nowhere in this process is there a place for subjective matters.[8]
*507 Applying this tripartite test to the present case, I conclude that the trial court's finding of juror misconduct is supported by the record. First, Isley originally testified that during deliberations another juror, Bill, listened to Isley's theory concerning Devoney's guilt (Isley had serious doubts about it) and then discredited the theory in light of the speeding ticket:
And the one guy [Bill] said, I hear your discussion, but taken all of that left aside, what about his prior driving record. That's the key. And from that point on, it was downhill discussing this. They said, look, he's done it before, and he did it this time, and if we let him go, he would do it again. Yes, there were discussions.
This statement, if true, denotes a collective intent to disregard the court's specific instruction to not consider the defendant's prior speeding ticket.
Second, Isley's testimony during the interview shows that three jurors in addition to Isley  i.e., a majority of the six-person panel  violated the instruction. If Isley is to be believed  and the trier of fact did believe him  the three jurors used the speeding ticket as a means to harangue and cajole the sole hold-out, Isley, until he could resist no more,[9] and then all four openly imputed both fault and guilt to Devoney based on his prior speeding ticket. This illicit discussion does not inhere in the verdict, but rather constitutes an objective, mutual understanding among the jurors to disregard the law and the court's instructions.[10] Rather than applying the law of the State of Florida as instructed by the court, the jurors instead imposed their own personal brand of justice based in part on the inadmissible speeding ticket.
And finally, competent substantial evidence supports the conclusion that the State failed to dispel every reasonable possibility of prejudice.[11] According to Isley's testimony, the prior speeding ticket was a major topic of discussion in the jury room and played a substantive role in the deliberations. The prior ticket was an inflammatory item in this DUI homicide case because the ticket could be  and apparently was  interpreted as establishing a pattern of dangerous and illegal driving.
Based on the foregoing, I conclude that the State has failed to show that the trial court abused its discretion in ordering a new trial, i.e., the State has not shown that no reasonable person would take the view adopted by the trial court.
I respectfully dissent.
KOGAN, C.J., and ANSTEAD, J., concur.
NOTES
[1] This rule was known as Lord Mansfield's Rule. See Vaise v. Delaval, 1 Term Rep. 11, 99 Eng. Rep. 944 (K.B.1785) (Chief Justice Mansfield ruled inadmissible jurors' affidavits that their verdict had been reached by lot.). This doctrine was based on a legal maxim borrowed from commercial law  nemo turpitudinem suam allegans audietur (a witness shall not be heard to allege his own turpitude). 8 John H. Wigmore, Evidence § 2352, at 696 (McNaughton rev. ed.1961). This maxim as long since been discarded. Id. § 2345, at 677.
[2] Rule 606(b) provides:

Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.
[3] While trial judges have broad discretion to grant new trials, the new trial order in this case was predicated upon an erroneous legal premise.
[4] Compare Wilding v. State, 674 So.2d 114 (Fla. 1996) (finding juror misconduct harmful where jurors in death case expressed collective fear to court employee that defendant had access to their personal information); Powell v. Allstate Ins. Co., 652 So.2d 354 (Fla.1995) (finding juror misconduct harmful where white jurors in personal injury action collectively disparaged black plaintiff in jury room); Keen v. State, 639 So.2d 597 (Fla.1994) (finding juror misconduct harmful where jurors in death case read magazine article in jury room concerning inflammatory defense tactics); State v. Hamilton, 574 So.2d 124 (Fla. 1991) (finding juror misconduct harmless where juror in death case took truck magazines into jury room); and Smith v. State, 95 So.2d 525 (Fla.1957) (finding juror misconduct harmful where jurors in murder trial were given dictionary by trial judge); with Baptist Hosp. v. Maler, 579 So.2d 97 (Fla.1991) (finding no actionable juror misconduct where jurors in personal injury action allegedly told defense lawyer post-trial that defendant hospital had won the case but that jury had awarded brain-damaged child $1.5 million out of sympathy); and Songer v. State, 463 So.2d 229 (Fla.1985) (finding no actionable juror misconduct where juror in death case allegedly believed she could consider only statutory mitigating circumstances).
[5] Maler, 579 So.2d at 100. The moving party must allege (a) objective conduct that is (b) improper and that (c) reasonably could have tainted the verdict. See generally Hamilton, 574 So.2d at 130 ("We hasten to note, however, that the evidentiary hearing ... need not be conducted when an unreasonable allegation of juror misconduct is made.... Thus, a hearing is unnecessary if the allegations, taken as true on their face, had no reasonable possibility of affecting the verdict.") (emphasis omitted).
[6] Maler, 579 So.2d at 100 n. 1. The moving party must establish juror misconduct as described above. See supra note 2. See also Wilding, 674 So.2d at 117-18 ("Any inquiry into juror misconduct must be limited to objective demonstration of overt acts committed by or in the presence of the jury or jurors which reasonably could have affected the verdict.").
[7] Maler, 579 So.2d at 100 n. 1 ("[T]he opposing party [must] demonstrate that there is no reasonable possibility that the juror misconduct affected the verdict.").
[8] See, e.g., Wilding, 674 So.2d at 117-18 ("The trial court clearly erred by asking the jurors whether the expressed concern factored into their decision-making process and relying on their assurances as a basis for denying Wilding's motion for mistrial."); Powell, 652 So.2d at 357 ("[I]t would be improper, after a verdict is rendered, to individually inquire into the thought processes of a juror to seek to discover some bias in the juror's mind, like the racial bias involved here, as a possible motivation of that particular juror to act as she did. Those innermost thoughts, good or bad, truly inhere in the verdict."); Keen, 639 So.2d at 599 ("Although it was appropriate to conduct a hearing, the trial court should not have asked two jurors how the article affected their decision-making process.").
[9] Juror "Bill" stated, "And is this what we really want to do, to turn this guy loose [in light of his prior ticket]." A second juror said pointedly to Isley, "If you want to turn him loose, that's what you'd have to live with [i.e., knowing that he had a prior ticket]." And a third commented, "Is this what we really want to do, is turn this young man a-loose [in light of the prior ticket]."
[10] Cf. Maler, 579 So.2d at 100 ("Any actual, express agreement between two or more jurors to disregard their oaths and instructions constitutes neither subjective impression nor opinion, but an overt act.").
[11] See supra note 4; see also Wilding, 674 So.2d at 118 ("Wilding was entitled to a new trial unless the State could demonstrate that there was no reasonable possibility that the misconduct affected the verdict.").