PER CURIAM.
 

 Jason Andrew Simpson appeals his convictions and death sentences for the July 1999 first-degree murders of Archie Crook, Sr., and Kimberly Kimbler. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Simpson’s convictions and death sentences.
 

 FACTS AND PROCEDURAL HISTORY
 

 The Guilt Phase
 

 In the late evening hours of July 15, 1999, or the early morning hours of July 16, 1999, Simpson went to the home of Archie Crook, Sr., and Kimberly Kimbler in Jacksonville, Florida, armed with an ax. Simpson entered the home, went into the master bedroom where Crook and Kimbler were sleeping, and proceeded to use the ax to hack Crook and Kimbler to death. Simpson inflicted several blows on Crook’s face and neck, breaking his jawbone and severing his carotid artery. Simpson struck Kimbler, who was between seven and seven and a half months pregnant, in the back of her arm, shattering the bone. Simpson then inflicted numerous blows on Kimbler’s head and neck, ultimately breaking her neck bone. Defensive wounds found on both victims showed that they attempted to fend off Simpson.
 

 Detectives located an ax containing Crook and Kimbler’s DNA in the backyard of the Crook and Kimbler home. They also located a sweatshirt, a pair of sweatpants, shoes, and a hat in a pile behind an air-conditioning unit on the property of a church located directly behind the home. Kimbler’s DNA was found on the sweatshirt, sweatpants, and shoes. Crook’s DNA was found on the sweatpants. Simpson’s DNA was found on the sweatshirt and sweatpants, and two of Simpson’s hairs were collected from the debris sweep of the sweatshirt, sweatpants, and hat. Fibers matching the sweatshirt and sweatpants were found on a barbed-wire fence located right behind the back door of the Crook and Kimbler home. Additionally, Simpson confessed to an acquaintance that he murdered Crook and Kimbler.
 

 On January 29, 2007, the jury found Simpson guilty of the first-degree murders of Crook and Kimbler.
 

 
 *1139
 
 The Penalty Phase
 

 The penalty phase commenced on February 6, 2007, at which time both the State and Simpson presented evidence. The State presented evidence that Simpson was previously arrested for armed robbery, which he admitted committing, and that during the robbery Simpson told the victim, “I’ll blow your brains out” and not to look at him again or he would “blow his Mother-Fing head off.” Simpson pleaded guilty in that case to the lesser-included offense of grand theft in exchange for cooperation with law enforcement in other cases.
 

 Simpson presented evidence from a psychiatrist who testified that violence was a constant feature in Simpson’s home during his developmental period, that he had a genetic predisposition to alcohol and substance abuse, and that he started using alcohol and drugs at age ten. Simpson’s alcohol and drug abuse continued until his arrest in this case, at which point he was using $1,000 a week worth of cocaine, plus other drugs and alcohol. The psychiatrist opined that both the inheritance pattern and observation of violence as a youth resulted in a twenty percent increase in the possibility of Simpson having a behavior problem or dissocial personality or becoming a criminal. Simpson attempted suicide numerous times, beginning when he was young, and several times during his hospitalization for drug abuse, depression, and psychiatric disorders, and during his incarceration.
 

 Simpson’s sister testified that she was terribly afraid of Simpson as a child because his moods would change, he often ran away from home, and he was threatening. His sister acted as a surrogate mother because his parents were largely absent from his life. Other witnesses presented by Simpson testified that he cooperated with law enforcement in other cases despite death threats to himself and his mother, that he was a good worker who was respectful, and that he was knowledgeable of the Bible and very religious.
 

 The jury returned a recommendation that Simpson be sentenced to death for the murder of Archie Crook, Sr., by a vote of eight to four, and that Simpson be sentenced to death for the murder of Kimberly Kimbler, by a vote of nine to three. A separate
 
 Spencer
 

 [1]
 

 hearing was held thereafter. In sentencing Simpson to death for both murders, the trial court found the following aggravating circumstances as to both victims: (1) the murders were committed while Simpson had been previously convicted of a felony and was on felony probation (great weight);
 
 [2]
 
 (2) Simpson had previously been convicted of a violent felony (great weight);
 
 [3]
 
 (3) the murders were committed while Simpson was engaged in the commission of a burglary (some weight); (4) the murders were especially heinous, atrocious, or cruel (“HAC”) (great weight) and; (5) the murders were committed in a cold, calculated, and premeditated manner (“CCP”) (great weight). The trial court found no statutory mitigating circumstances, but found sixteen non-statutory mitigating circumstances.
 
 [4]
 
 
 *1140
 
 Finding that the aggravating circumstances far outweighed the mitigating circumstances, the trial court sentenced Simpson to death for both murders.
 

 ANALYSIS
 

 Simpson raises six issues on appeal,
 
 [5]
 
 the first four of which are related to a juror’s alleged recantation of her guilty verdict. In addition to the issues raised by Simpson, this Court must consider whether the evidence was sufficient to support Simpson’s convictions and whether the death sentences are proportionate. We now address each issue.
 

 Juror Cody’s Alleged Recantation of Her Guilty
 
 Verdicts—
 
 Issues 1 through 4
 

 On January 29, 2007, the jury returned its verdict finding Simpson guilty of the first-degree murders of Crook and Kim-bler. The jury was polled and each juror indicated that the verdict was his or hers. Over a week later, on February 6, 2007, before any evidence was presented in the penalty phase, the trial judge informed the parties that juror Colleen Cody notified his judicial assistant that she would like to speak with the judge. The judge called juror Cody into the courtroom, at which time she stated that “there were some questions that were unanswered before the verdict was made.” The judge conferred with the attorneys and defense counsel moved for a mistrial. The judge deferred ruling on the motion and the parties decided to question juror Cody. Defense counsel requested that the judge clear the courtroom for the questioning asserting that the victim’s family and the press were present and juror Cody was obviously uncomfortable. The judge denied the request.
 

 During the questioning, juror Cody expressed that the guilty verdict was not her verdict because some of the other jurors told her to weigh the physical evidence more heavily than the other evidence. Nonetheless, juror Cody confirmed that based upon that weighing process, the jury as a whole reached a unanimous verdict that Simpson was in fact guilty beyond a reasonable doubt. After the questioning, defense counsel renewed his motion for a mistrial, which the trial court denied.
 

 
 *1141
 
 The parties proceeded to present their penalty phase evidence. While the jurors were engaged in penalty phase deliberations, defense counsel again renewed his motion for a mistrial and moved to individually question each juror after they entered their penalty phase verdicts, but before they were discharged. The judge reserved ruling pending the answers juror Cody provided to the judge’s additional questions. The jury returned with its verdict, recommending that Simpson be sentenced to death by a vote of eight to four as to Crook and nine to three as to Kimbler, and the jurors were polled. All jurors, including juror Cody, replied “yes” when asked whether they agreed that a majority of the jury joined in the advisory sentence.
 

 Thereafter, the judge asked the jury, with the exception of juror Cody, to return to the jury room. The judge then asked juror Cody whether she in fact voted to find Simpson guilty of the two counts of murder. Juror Cody replied, “I did.” Juror Cody then confirmed that when the jury was polled after the verdicts were entered in the guilt phase, she in fact answered that the guilty verdicts were hers. Finally, juror Cody agreed that the confusion concerning weighing the evidence arose because of conversations with fellow jurors or other matters that occurred during the deliberations. At sidebar, defense counsel asked to further inquire of juror Cody, but the judge denied the request concluding that the matters discussed by juror Cody inhered in the verdict. Defense counsel then asked to interview the other jurors. The judge similarly denied this request. After trial, Simpson filed a motion for new trial arguing that the trial court erred in denying his motion for a mistrial and a motion for individual and sequestered jury interviews. The trial court denied both motions.
 

 Motion for Mistrial or Requiring Further Deliberation — Issue 1
 

 Simpson’s first argument concerning the issue of juror Cody’s alleged recantation is that the trial court erred in not granting his motion for a mistrial or, alternatively, requiring the jurors to deliberate further when juror Cody recanted her verdict. We disagree.
 

 To determine whether the trial court erred in not granting Simpson a mistrial, or in not requiring the jurors to deliberate further, it is necessary to determine whether juror Cody had a right to recede from her guilty verdicts more than a week after she entered them, but before the penalty phase commenced. We conclude that she did not.
 

 The right of a defendant to poll the jury and the right of a juror to repudiate his or her verdict are derived from common law. As this Court explained in
 
 Grant v. State,
 
 33 Fla. 291, 14 So. 757 (1894):
 

 By the common-law procedure, then, the verdict of the jury was orally pronounced in open court, then recorded by the clerk, and affirmed by the jury, which was done by that officer saying to them to hearken to them verdict as recorded by the court, and repeating to them what had been taken down for record. At any time before the verdict was recorded the prisoner had the right to have the jury polled, in order to ascertain whether or not the verdict as given was unanimous, and, in the absence of a polling, any member of the jury had the right, sua sponte, to recede from the verdict as agreed on at any time before it was recorded. As the jury had the right to depart from any finding before it was recorded and affirmed by them, the only complete ver-
 
 *1142
 
 diet in a case was that recorded by the court.
 

 Id.
 
 at 759;
 
 see also Bratton v. State,
 
 632 So.2d 1080, 1082 (Fla. 4th DCA 1994) (“The right to recede from a verdict in open court through jury polling emanates from common law. At common law, the verdict was pronounced in open court and affirmed by the jury being asked to ‘hearken to their verdict.’ ”) (quoting
 
 Grant,
 
 14 So. at 759). This procedure was formalized in Florida Rules of Criminal Procedure 3.440 and 3.450. Rule 3.440, titled “Rendition of Verdict; Reception and Recording,” provides:
 

 When the jurors have agreed upon a verdict they shall be conducted into the courtroom by the officer having them in charge. The court shall ask the foreperson if an agreement has been reached on a verdict. If the foreperson answers in the affirmative, the judge shall call on the foreperson to deliver the verdict in writing to the clerk. The court may then examine the verdict and correct it as to matters of form with the unanimous consent of the jurors. The clerk shall then read the verdict to the jurors and, unless disagreement is expressed by one or more of them or the jury is polled, the verdict shall be entered of record, and the jurors discharged from the cause. No verdict may be rendered unless all of the trial jurors concur in it.
 

 Fla. R.Crim. P. 3.440. Rule 3.450, titled “Polling the Jury,” provides:
 

 On the motion of either the state or the defendant or on its own motion, the court shall cause the jurors to be asked severally if the verdict rendered is their verdict. If a juror dissents, the court must direct that the jury be sent back for further consideration. If there is no dissent the verdict shall be entered of record and the jurors discharged. However, no motion to poll the jury shall be entertained after the jury is discharged or the verdict is recorded.
 

 Fla. R.Crim. P. 3.450.
 

 Under these rules, juror Cody had no right to recede from her guilty verdict under the
 
 circumstances in
 
 this case. Because no juror, including juror Cody, expressed disagreement with the verdict and all twelve jurors responded affirmatively when asked whether the verdicts were in fact theirs, the clerk was required to record the verdict.
 
 See
 
 Fla. R.Crim. P. 3.440. Moreover, because no juror dissented from the guilty verdicts during polling, the trial court was not required to send the jury back for further deliberation, but rather was required to record the verdict.
 
 See
 
 Fla. R.Crim. P. 3.450. The signed verdict forms, indicating that the verdicts were unanimous, were recorded on January 29, 2007, the same day the verdicts were announced. Under rules 3.440 and 3.450, juror Cody could have receded from her verdicts either after the verdicts were read by the court or when polled, but she did not do so.
 

 Simpson incorrectly argues that the crux of this issue is whether the commencement of the penalty phase constitutes discharge of the jurors in a death case
 
 for the
 
 purpose of evaluating whether they may recede from their guilt phase verdicts. The proper inquiry is whether the verdict was recorded under rules 3.440 and 3.450, not whether the jury was discharged. Further, to the extent Simpson contends that this case is analogous to
 
 James v. State,
 
 453 So.2d 786 (Fla.1984),
 
 Chung v. State,
 
 641 So.2d 942 (Fla. 5th DCA 1994),
 
 State v. Thomas,
 
 405 So.2d 220 (Fla. 3d DCA 1981), and
 
 Masters v. State,
 
 344 So.2d 616 (Fla. 1st DCA 1977), we disagree.
 
 Chung
 
 and
 
 Thomas
 
 are distinguishable from the instant case because the record indicates juror Cody clearly and
 
 *1143
 
 unequivocally responded “yes” when polled, unlike the jurors at issue in
 
 Chung
 
 and
 
 Thomas.
 
 Further, we deem
 
 James
 
 and
 
 Masters
 
 distinguishable from this case because the issue here is
 
 not
 
 whether discharge occurred such that the jury could not be reimpaneled to hear matters relating to the same case. The issue is at what point juror Cody was permitted to recede from her guilty verdicts — an issue not present in
 
 James
 
 or
 
 Masters.
 

 Thus, the trial court did not err in denying Simpson’s motion for a mistrial, or in not requiring the jury to deliberate further, because once the guilty verdicts were recorded, the jury’s role as to the guilt phase had ended.
 

 The only permissible way the trial court could have considered juror Cody’s repudiation of her guilty verdicts more than a week after they were announced and recorded as defined in rules 3.440 and 3.450 would be if the conduct giving rise to her decision to recede did not inhere in the verdicts. As explained by this Court in
 
 Devoney v. State,
 
 717 So.2d 501 (Fla.1998):
 

 Many year’s ago, this Court established guidelines with respect to the propriety of inquiry into matters occurring in the jury room. We explained
 

 [tjhat affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself, as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or game of chance or other artifice or improper manner; but that such affidavit to avoid the verdict may not be received to show any matter which does essentially inhere in the verdict itself, as that the juror did not assent to the verdict; that he misunderstood the instructions of the Court; the statements of the witnesses or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow-jurors, or mistaken in his calculations or judgment, or other matter resting alone in the juror’s breast.
 

 Id.
 
 at 502 (quoting
 
 Marks v. State Road Dep't,
 
 69 So.2d 771, 774-75 (Fla.1954)). In
 
 Devoney,
 
 this Court further noted that “[t]he Florida Evidence Code codifies the sanctity of the jury verdict by providing that ‘[ujpon an inquiry into the validity of a verdict or indictment, a juror is not competent to testify as to any matter which essentially inheres in the verdict or indictment.’ ” 717 So.2d at 502 (quoting § 90.607(2)(b), Fla. Stat. (1993)).
 

 We conclude that the matters giving rise to juror Cody’s alleged recantation did inhere in the verdicts, and thus her verdicts were not impeachable.
 
 Mitchell v. State,
 
 527 So.2d 179 (Fla.1988), is instructive. There, on direct appeal of his first-degree felony murder conviction and death sentence, Mitchell argued, inter alia, that he should be granted a new trial because one of his jurors averred, in an affidavit a week after trial, that she was pressured into returning a verdict of guilty by one of the other jurors and that other jurors had placed the burden on Mitchell to prove his innocence.
 
 Id.
 
 at 181. This Court declined to grant Mitchell a new trial, recognizing:
 

 It is a well settled rule that a verdict cannot be subsequently impeached by conduct which inheres in the verdict and relates to the jury’s deliberations. This principle has also been applied in capital cases. Consequently, we cannot consider the juror’s comments as requiring a
 
 *1144
 
 new trial because all of the activities mentioned involve the jury’s deliberations and inhere in the verdict.
 

 Id.
 
 at 181-82 (citations omitted).
 

 The trial court did not abuse its discretion in concluding that juror Cody’s expression of confusion arising from other jurors’ misstatements of the law was inherent in the verdicts and, therefore, not a permissible method of impeaching those verdicts. Juror Cody unequivocally stated that the reason she voted guilty was because she was confused by other jurors’ representations that the jury should consider only the physical evidence and not the testimony presented in the case and that the jury should weigh the physical evidence more heavily than the testimony when reaching a verdict. This is clearly a matter that inheres in the verdict because it involves a claim that jurors misunderstood the instructions of the Court or were unduly influenced by the statements of other jurors.
 
 See Devoney,
 
 717 So.2d at 502. Juror Cody did not allege any influence on jury deliberations arising from external sources.
 
 See id.
 
 at 503 (“Those cases which have permitted an attack upon a jury verdict have required allegations of an influence upon the jurors’ deliberations arising from external sources.”). Further, juror Cody did not allege that there was an express agreement among the jurors to disregard their oaths and instructions.
 
 See Baptist Hosp. of Miami, Inc. v. Maler,
 
 579 So.2d 97, 100 (Fla.1991) (“Any actual, express agreement between two or more jurors to disregard their oaths and instructions constitutes neither subjective impression nor opinion, but an overt act. It thus is subject to judicial inquiry even though that inquiry may not be expanded to ask what impressions or opinions motivated jurors to enter into the agreement in the first instance.”).
 

 Accordingly, Simpson’s claim that the trial court erred in denying his motion for a mistrial or in not requiring the jury to deliberate further is without merit.
 

 Proceeding to Penalty Phase and Motion for Jury Interview— Issues 2 and 3
 

 Because we conclude that juror Cody could not recede from her verdict, we summarily dispose of Issues 2 and 3 concerning this juror. The trial court did not err in allowing the jury to proceed to the penalty phase after juror Cody expressed that the guilty verdicts were not hers because there was no basis for allowing juror Cody to recede from her verdict. The trial court also did not err in denying Simpson’s motion for a jury interview because juror Cody’s concerns arose from matters which inhered in the verdict itself and thus could not be the subject of a jury interview.
 
 See Reaves v. State,
 
 826 So.2d 932, 943 (Fla.2002) (“Juror interviews are not permitted relative to any matter that inheres in the verdict itself and relates to the jury’s deliberations.”).
 

 Simpson’s Motion to Exclude the Public from the Courtroom During Questioning of Juror Cody — Issue 4
 

 Defense counsel moved the court to exclude the public from the courtroom during the questioning of juror Cody because she initially requested to speak to the judge in private, she was “timid” when the guilty verdicts were read, and she appeared “very uncomfortable” before being questioned. Defense counsel expressed concern that failure to close the courtroom during the questioning would prejudice Simpson. Simpson argues on appeal that the trial court erred in denying his motion because it did not conduct an adequate inquiry into whether closure of the courtroom was necessary. This claim lacks merit.
 

 In
 
 Barron v. Florida Freedom Newspapers, Inc.,
 
 531 So.2d 113 (Fla.1988), this
 
 *1145
 
 Court held that “both civil and criminal court proceedings in Florida are public events and adhere to the well established common law right of access to court proceedings and records.”
 
 Id.
 
 at 116. “Public trials are essential to the judicial system’s credibility in a free society.”
 
 Id.
 
 However, as explained by this Court in
 
 Miami Herald Publishing Co. v. Lewis,
 
 426 So.2d 1 (Fla.1982), this proposition is counterbalanced by the proposition that courts have the inherent power to preserve order and decorum in the courtroom, as well as the responsibility to protect the rights of the parties and witnesses and to further the administration of justice.
 
 Id.
 
 at 3.
 
 Lewis
 
 articulated the prevailing test in Florida for closure of judicial proceedings, concluding that closure is justified where:
 

 1. Closure is necessary to prevent a serious and imminent threat to the administration of justice;
 

 2. No alternatives are available, other than change of venue, which would protect a defendant’s right to a fair trial; and
 

 8. Closure would be effective in protecting the rights of the accused, without being broader than necessary to accomplish this purpose.
 

 426 So.2d at 6;
 
 see also Bundy v. State,
 
 455 So.2d 330, 338 (Fla.1984) (recognizing adoption of test in Lewis),
 
 abrogated on other grounds by Fenelon v. State,
 
 594 So.2d 292 (Fla.1992).
 

 There is no indication in the record that the trial court failed to conduct the analysis required under
 
 Lewis.
 
 The court’s ruling shows that it considered the propriety of exclusion, noting that it was required to exclude the other jurors, and balanced the rights of Simpson with the rights of the press and the victims’ families. Further, Simpson failed to support his motion and argument on appeal with anything other than a bald assertion of prejudice, devoid of factual or legal support. Thus, we conclude that the trial court properly denied Simpson’s motion to exclude the public from the courtroom during the questioning of juror Cody.
 

 Based on the foregoing, we conclude that the trial court did not err in its handling of the issues arising from juror Cody’s alleged recantation of her guilty verdicts.
 

 Ruling on Admissibility of Reverse Williams Rule Evidence
 

 Simpson filed a motion seeking a pretrial ruling on the admissibility of alleged “reverse
 
 Williams
 
 rule” evidence.
 
 [6]
 
 Simpson claims on appeal that he is entitled to a new trial because the trial court never ruled on his motion, as shown by the trial court’s unsigned order indicating that it was taking the matter under advisement. We disagree for several reasons.
 

 First, defense counsel never sought a ruling on the motion after a
 
 *1146
 
 hearing was held on the motion. A party’s failure to obtain a ruling on a motion fails to preserve the issue for appeal.
 
 See Armstrong v. State,
 
 642 So.2d 730, 740 (Fla.1994) (concluding that appellant’s claim that the trial court erred in failing to grant his pretrial request for an MRI to determine whether he had a brain tumor was procedurally barred because the trial judge reserved ruling on the issue and never issued a ruling). The second reason this claim lacks merit is that the trial court essentially ruled on Simpson’s motion to the extent it could do so given the minimal amount of detail defense counsel provided as to the evidence he intended to introduce. At the end of the hearing on the motion, after the trial court explained that it “would cross that bridge” when the defense decided how it was going to present its case because it did not want to “foreclose [defense counsel] from presenting anything that’s relevant,” defense counsel responded, “I understand” and “I understand the ruling.” Finally, defense counsel never sought to proffer any testimony related to the reverse
 
 Williams
 
 rule evidence he referred to in his pretrial motion and at the hearing.
 
 See, e.g., Trease v. State,
 
 768 So.2d 1050, 1054 (Fla.2000) (“Having failed to demonstrate the relevancy of the sought-after testimony by way of proffer, Trease cannot now claim error.”) (citing
 
 Finney v. State,
 
 660 So.2d 674, 684 (Fla.1995)) (“Without a proffer it is impossible for the appellate court to determine whether the trial court’s ruling was erroneous and if erroneous what effect the error may have had on the result.”);
 
 Lucas v. State,
 
 568 So.2d 18, 22 (Fla.1990) (holding that a party’s failure to proffer what a witness would have said on cross-examination renders an alleged trial court error in the exclusion thereof unpre-served).
 

 Based on the foregoing, we deny relief on this claim.
 

 Improper Prosecutorial Comments During Guilt and Penalty Phase Closing Arguments
 

 We have considered Simpson’s claim of improper prosecutorial argument. He admits that no objection was made to any of the comments. In
 
 Brooks v. State,
 
 762 So.2d 879 (Fla.2000), we recognized:
 

 As a general rule, this Court has determined that failing to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review. The sole exception to the general rule is where the unobject-ed-to comments rise to the level of fundamental error, which has been defined as error that “reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.”
 

 Id.
 
 at 898-99 (citations omitted) (quoting
 
 McDonald v. State,
 
 743 So.2d 501, 505 (Fla.1999)). None of the comments individually or collectively rises to the level of fundamental error. In fact, the majority of the comments were based on facts in evidence and therefore proper.
 
 See Gonzalez v. State,
 
 990 So.2d 1017, 1028-29 (Fla.2008) (“[T]he proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.”) (quoting
 
 Bertolotti v. State,
 
 476 So.2d 130, 134 (Fla.1985));
 
 Gore v. State,
 
 719 So.2d 1197, 1200 (Fla.1998) (recognizing that attorneys are permitted wide latitude in closing argument, but that latitude does not extend to allow improper argument). Several of the comments could be construed as impermissible bolstering.
 
 See Gorby v. State,
 
 630 So.2d 544, 547 (Fla.1993).
 
 [7]
 
 
 *1147
 
 However, the comments were brief and in no way do they constitute fundamental error.
 

 Accordingly, Simpson’s claim of error fails.
 

 Sufficiency of the Evidence
 

 Simpson has not challenged the sufficiency of the evidence, but this Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed.
 
 See Jones v. State,
 
 963 So.2d 180, 184 (Fla.2007); Fla. R.App. P. 9.142(a)(6) (“In death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.”). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.”
 
 Simmons v. State,
 
 934 So.2d 1100, 1111 (Fla.2006) (quoting
 
 Bradley v. State,
 
 787 So.2d 732, 738 (Fla.2001)). Furthermore, because this case is not entirely circumstantial, in that the State introduced Durrance’s testimony that Simpson confessed that he killed Crook and Kimbler, the special standard of review applicable to solely circumstantial cases does not apply.
 
 See Simmons,
 
 934 So.2d at 1111 (“[W]hen the evidence in a case is ‘both direct and circumstantial, it is unnecessary to apply the special standard of review applicable to circumstantial evidence cases’ ”) (quoting
 
 Pagan v. State,
 
 830 So.2d 792, 803 (Fla.2002)).
 

 We conclude that the record contains competent, substantial evidence to support Simpson’s convictions for the first-degree murders of Crook and Kimbler. The State presented evidence that Simpson confessed to Durrance. This constituted direct evidence of Simpson’s guilt.
 
 See Murray v. State,
 
 838 So.2d 1073, 1087 (Fla.2002). Moreover, there was evidence that Simpson’s DNA was on the sweatshirt and sweatpants that were linked to the murders in that they contained the victims’ blood, were found on the church property directly behind Crook’s house, and matched material found on the barbed wire fence right outside the back door to the house. Simpson’s hairs were found among the sweatshirt, sweatpants, and hat. Finally, other circumstantial evidence suggested Simpson’s guilt, such as: Simpson’s initial denial of knowing the victims and his immediate departure from the police interview after being asked whether he
 
 *1148
 
 knew Archie Crook, Sr.; his denial that the clothing, hat, and shoes were his; his freshly injured hand and conflicting story about how he got the injury; and the telephone number of his mother’s home, where he stayed, as the last number on the victims’ pager.
 

 Based on a review of the evidence presented in this case, a “rational trier of fact could have found the existence of the elements of the crime[s] beyond a reasonable doubt.”
 
 Simmons,
 
 934 So.2d at 1111 (quoting
 
 Bradley,
 
 787 So.2d at 738). Thus, there was sufficient evidence to support Simpson’s convictions.
 

 Proportionality
 

 Simpson does not challenge the proportionality of his death sentences, but this Court reviews all death sentences for proportionality “regardless of whether the issue is raised on appeal.”
 
 England v. State,
 
 940 So.2d 389, 407 (Fla.2006); see
 
 also
 
 Fla. R.App. P. 9.142(a)(6). The death penalty is “reserved only for those cases where the most aggravating and least mitigating circumstances exist.”
 
 Terry v. State,
 
 668 So.2d 954, 965 (Fla.1996). Therefore, in deciding whether death is a proportionate penalty, the Court makes a “comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.”
 
 Anderson v. State,
 
 841 So.2d 390, 407-08 (Fla.2003) (citations omitted). Accordingly, the Court considers the totality of the circumstances and compares the case with similar capital cases.
 
 See Duest v. State,
 
 855 So.2d 33, 47 (Fla.2003). This analysis “is not a comparison between the number of aggravating and mitigating circumstances.”
 
 Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990). Rather, this entails “a
 
 qualitative
 
 review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.”
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998). In reviewing the sentence for proportionality, this Court will accept the jury’s recommendation and the trial court’s weighing of the aggravating and mitigating evidence.
 
 See Bates v. State,
 
 750 So.2d 6, 12 (Fla.1999).
 

 We conclude that the death penalty is a proportionate punishment for the first-degree murders of Archie Crook, Sr., and Kimberly Kimbler. This case involves the vicious and brutal ax murder of two victims in the privacy of then- home, and a finding of five aggravators, and no statutory mitigators. The trial court found the following five aggravating circumstances as to both murders: (1) the crime for which the defendant was to be sentenced was committed while he had been previously convicted of a felony and was on felony probation (stipulated to); (2) the defendant had previously been convicted of a felony involving the use or threat of violence to the person; (3) the capital felony was committed while the defendant was engaged in the commission of the crime of burglary; (4) HAC; and (5) CCP. The trial court found no statutory mitigation as to either murder, but found several nonstatu-tory mitigating circumstances as to both murders ranging from assisting law enforcement in other cases to alcoholism in the family to suicide attempts.
 

 In
 
 Bevel v. State,
 
 983 So.2d 505 (Fla.2008), this Court found the death penalty proportionate where, as here, the defendant committed a double murder and there were no statutory mitigators. Here, as in
 
 Bevel,
 
 the prior violent felony aggravator applied based on the double murder as well as an earlier felony (attempted robbery).
 
 See id.
 
 at 524-25. Further, in
 
 Lynch v. State,
 
 841 So.2d 362 (Fla.2003), this Court found the death sentence proportionate where, as here, the case involved a double murder and the aggrava-tors included CCP, prior violent felony,
 
 *1149
 
 and that the murder was committed during a felony as to one victim, and HAC, prior violent felony, and that the murder was committed during a felony as to the other victim. Also, in
 
 Lynch,
 
 as in the instant case, the trial court found several nonstat-utory mitigators, but in contrast to this case, the court in
 
 Lynch
 
 found one statutory mitigator.
 
 Id.
 
 at 377-78. Finally, in
 
 England v. State,
 
 940 So.2d 389 (Fla.2006), this Court found the death penalty to be a proportionate punishment where, as here, there were the aggravators of felony probation, prior violent felony, HAC, and that the murder was committed during the commission of another felony.
 
 Id.
 
 at 408. Also as in this case, the trial court found no statutory mitigation. Moreover, in this case CCP applies and there were two murders.
 

 Based on the specific facts and circumstances of the murders and the aggrava-tors and mitigators found by the trial court in this case, we conclude that when compared with other capital cases, the death sentences in this case are proportionate. Accordingly, the death sentences are affirmed.
 

 CONCLUSION
 

 After a thorough review of all of the issues raised by Simpson, and after our own independent review of the sufficiency of the evidence and the proportionality of the sentences, we affirm Simpson’s convictions for first-degree murder and the sentences of death.
 

 It is so ordered.
 

 QUINCE, C.J., and WELLS, PARIENTE, LEWIS, CANADY, and POLSTON, JJ., concur.
 

 LABARGA, J., did not participate.
 

 [1]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [2]
 

 . Simpson stipulated that he was convicted of the crime of armed burglary and was on felony probation for that crime at the time of the murders.
 

 [3]
 

 . The State introduced a judgment and sentence evidencing that Simpson was previously charged with armed robbery, but was convicted of grand theft pursuant to a guilty plea. In finding the prior violent felony aggravator, the trial court noted that while grand theft is not ordinarily a crime involving the use or threat of violence, the State presented testimony from the victim of that crime and a police officer involved in the investigation that established that Simpson held the victim at gunpoint and told him to get on the ground or he would “blow his brains out.”
 

 [4]
 

 .The nonstatutory mitigating circumstances included: (1) cooperation with law enforce
 
 *1140
 
 ment in a drug case (considerable weight); (2) cooperation with law enforcement in several investigations (considerable weight); (3) abused and deprived childhood/exposed to violence in the home (slight weight); (4) exposed to alcoholism in the family (slight weight); (5) unstable home environment (slight weight); (6) addiction to drugs and drug abuse (little weight); (7) completed substance abuse classes (little weight); (8) charitable and humanitarian deeds (little weight); (9) personal accomplishments — schooling (slight weight); (10) artistic talent (little weight); (11) good and respectful son to his parents and grandparents (little weight); (12) has family and friends that love him (slight weight); (13) society can be protected by a sentence of life imprisonment (no weight); (14) religious faith (slight weight); (15) appropriate courtroom behavior (slight weight); and (16) suicide attempts (slight weight).
 

 [5]
 

 . Simpson argues on appeal that (1) the trial court erred in not granting a mistrial or requiring that the jury deliberate further when a juror recanted her guilty verdict before evidence was presented in the penalty phase; (2) the trial court erred in denying Simpson's motion to exclude the public from the courtroom during the questioning of the juror; (3) the trial court erred in allowing the jury to proceed to the penalty phase after hearing testimony from the juror that the guilty verdict was not hers; (4) the trial court erred in not granting Simpson's motion for a jury interview when the juror recanted her guilty verdict before the jury proceeded to the penalty phase; (5) the trial court erred in not making a definitive ruling on Simpson’s motion for a pretrial ruling on the admissibility of "reverse
 
 Williams
 
 rule” evidence,
 
 Williams v. State,
 
 110 So.2d 654 (Fla.1959); and (6) the State committed prosecutorial misconduct during the guilt and penalty phase closing arguments, resulting in fundamental error.
 

 [6]
 

 . In
 
 McDuffie v. State,
 
 970 So.2d 312 (Fla.2007), this Court explained:
 

 The
 
 “'Williams
 
 rule” takes its name from
 
 Williams v. State,
 
 110 So.2d 654 (Fla.1959), and is codified at section 90.404(2), Florida Statutes (2005). This rule allows introduction of similar fact evidence of other crimes or acts by the defendant that are relevant to prove a material matter in the prosecution. “Reverse
 
 Williams
 
 rule" evidence is evidence of a crime committed by another person that a defendant offers to show his or her innocence of the instant crime.
 
 See Rivera v. State,
 
 561 So.2d 536, 539 (Fla.1990). The defendant must demonstrate a "close similarity of facts, a unique or ‘fingerprint’ type of information” for the reverse
 
 Williams
 
 rule evidence to be admissible.
 
 White v. State,
 
 817 So.2d 799, 806 (Fla.2002) (quoting
 
 State v. Savino,
 
 567 So.2d 892, 894 (Fla.1990)). Exclusion of reverse
 
 Williams
 
 rule evidence is subject to abuse of discretion review.
 
 Huggins v. State,
 
 889 So.2d 743, 761 (Fla.2004).
 

 McDuffie,
 
 970 So.2d at 323 n. 2.
 

 [7]
 

 . The prosecutor stated that witness George Michael Durrance, to whom Simpson confessed to committing these murders, was “honest and forthright" about why he delayed reporting Simpson's confession. Durrance testified
 
 *1147
 
 that he delayed reporting the confession because he was a high-level drug trafficker and Simpson had knowledge of his activities, so he believed it would be like turning himself in. Next, the prosecutor stated that Durrance was "smart” in terms of his knowledge of the criminal justice system such that he knew if he came forward with information he might get leniency. The prosecutor then stated that Durrance knew he needed to provide “credible" information to get any leniency. Finally, the prosecutor stated, "Unlike in Mike Dur-rance's case where the evidence proves to you that he's telling the truth, when you compare [Simpson's] testimony to the other evidence in this case you show that it is simply unbelievable.”
 

 Although some of these comments, such as the "smart” and "credible" comments, may not have been improper in the context in which they were made — namely, the prosecutor's discussing Durrance's criminal history, desire for leniency, and delay in reporting Simpson's confession — together with the other clearly improper comments vouching for Durrance's credibility, they impermissibly "place[d] the prestige of the government behind the witness or indicate[d] that information not presented to the jury supported] the witness’s testimony."
 
 Spann v. State,
 
 985 So.2d 1059, 1067 (Fla.2008) (quoting
 
 Hutchinson v. State,
 
 882 So.2d 943, 953 (Fla.2004),
 
 abrogated on other grounds by Deparvine v. State,
 
 995 So.2d 351 (Fla.2008)).