674 So.2d 114 (1996)
Neil Wilson WILDING, Appellant,
v.
STATE of Florida, Appellee.
No. 82696.
Supreme Court of Florida.
May 16, 1996.
*115 Richard L. Jorandby, Public Defender, and Jeffrey L. Anderson, Assistant Public Defender, West Palm Beach, for Appellant.
Robert A. Butterworth, Attorney General, and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, for Appellee.
PER CURIAM.
Neil Wilson Wilding appeals his convictions and sentences, which include a sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we reverse and remand for a new trial.
In June 1992, Neil Wilson Wilding was charged with the August 1988 murder of a Vero Beach woman. On August 28, 1988, the woman's parents found their daughter dead in her apartment, lying face down on the couch. The woman had been strangled and there was evidence that she had been sexually assaulted prior to her death. The evidence included a towel, containing blood and semen stains, which was found on the floor next to the couch where the body was found. A window in the apartment was found open; the screen had been pushed in so that someone could easily reach through and unlock the front door. There was evidence of a struggle: a rug on the floor next to the couch had been disrupted, cushions from the couch had been knocked off, and streak marks were found on the wall behind the couch.
Initially police had three suspects, each of which were eliminated. Finally, after receiving an anonymous tip in April 1989 which named Neil Wilding, the Vero Beach Police Department focused its investigation on Wilding. Police talked to Wilding's family and friends. Blood samples were eventually drawn from Wilding's wife and daughter in July 1991. DNA testing revealed that there was a 99.96 percent probability that the donor of the semen found on the towel was the father of Wilding's daughter. Wilding was located in April 1992, when he was arrested for a traffic violation in Oklahoma. Blood samples were taken from Wilding after his arrest. DNA testing revealed that although 99.8 percent of the population was eliminated as being a possible contributor of the semen on the towel found at the scene, Wilding could not be eliminated as the donor.
After a jury trial, Wilding was found guilty of first-degree murder, sexual battery with physical force likely to cause serious personal injury, and burglary during which the defendant committed a battery. After one of the guilt-phase jurors made a phone call to the clerk's office to inquire about the defendant, the jury was dismissed before the penalty phase began and a new jury was empaneled. After a sentencing hearing, the newly empaneled jury recommended death. The trial court followed the recommendation and imposed the death penalty.[1]
Wilding appeals his convictions and sentences. Of the thirty-one claims raised,[2] we *116 only need address claims seven, one, and eleven, which we find dispositive.
We address Wilding's seventh claim first. Our review of the record and caselaw supports Wilding's claim that he is entitled to a new trial because as a result of jury misconduct he was deprived of a fair and impartial guilt-phase jury, as guaranteed by the Sixth Amendment to the United States Constitution and article I, section 16 of the Florida Constitution. After the jury reached a guilty verdict but prior to the beginning of the penalty phase of the trial, a court employee notified the trial judge that a juror had contacted the clerk's office and indicated that several of the jurors were concerned that Wilding had access to their personal information. When the trial judge informed counsel of the incident, defense counsel moved to strike the panel and to empanel a new jury for the penalty phase.
The employee who spoke to the juror was then questioned under oath. According to the employee, the woman who called the clerk's office said a couple of the jurors on the Neil Wilding case were concerned that the defendant might have access to their personal information. The caller told the employee that the jurors were concerned that Wilding could get this information and wanted to know if it was normal for the defendant to have access to such information and if it was not they wanted something done about it. The employee told the juror she would check with the court clerk and to call back later; but the juror never did. After this inquiry the trial judge found,
As I understand what the juror has said to the clerk was that they wanted something done about the fact that the Defendant had access [to their personal information]. That certainly leads me to believe that persons that were of that mind were afraid of the Defendant. I think that's a very clear possibility. If somebody calls to inquire and says she wants something done about it and they're concerned about it, that to me indicates that they have some fear of the Defendant, of what he wrote down or anything else.
And once I reach that conclusion, it seems to me that those sort of jurors, if they had been identified at the beginning of the trial, probably would not have sat as jurors in this case. And so I'm concerned about them, those jurors who are on the jury panel that felt that way. And it's not *117 simply one to now be in a position to make a recommendation to me.
The prosecutor asked to be allowed to research the issue before the trial court ruled. After speaking with the Attorney General's office, the prosecutor told the court that it needed to make findings and suggested that the court inquire of the jurors.
The trial court then called in the women jurors one at a time and initially asked each juror whether she had made a call to the clerk's office that morning. The third juror called told the court that she had made the call. When asked to explain what the call entailed the juror responded:
Several of us were kind of concerned that when the jurors were beingwell, when you were trying to choose a jury, it appeared to us the Defendant had access to... our names, addresses and phone numbers, the number of children we have. And that caused a little bit of anxiety among the jurors.
The juror in question further testified that four or five jurors in the venire had reason to believe that Wilding might have access to their personal information and at least three of those jurors sat on the jury. According to the juror who had made the call, several of the jurors discussed their concerns. The topic was discussed both before and after the jury was selected and may have come up after deliberations had begun, although it was not brought up in front of the entire jury. The trial court went on to ask this juror, "Do you think that your concerns about what you saw had some affect on your deliberations in this case?" The juror responded "No."
After inquiring of the juror who had called the clerk's office, the trial court expressed concern as to the verdict and questioned the other jurors. From that testimony, it appears that several of the jurors shared the concern about Wilding having access to their personal information. It also was confirmed that a number of the jurors either discussed their concerns or overheard others discussing their concerns before and after the jury was empaneled and some of these discussions may have occurred in the jury room prior to the verdict. As it did of the first juror, the trial court asked each of the jurors who admitted sharing the concern or being made aware of the concern whether the concern played a part in the verdict. Each of the jurors responded that it did not.
After inquiring of the jurors, the trial court and both attorneys agreed that the panel had to be stricken for the penalty phase. The trial court explained that justice and fairness require that a penalty-phase jury consists of jurors that are not afraid that the defendant might know something about them. The trial court also explained it had anticipated striking the panel and had inquired of the jury to find out and make a record of whether the jurors' concerns had affected the guilt-phase verdict.
After the jury was dismissed, defense counsel moved for a mistrial as to the guilt phase, pointing out that the inquiry revealed that in reaching a verdict the jurors may have relied on something other than the evidence presented, such as fear of or other bias against the defendant. In arguing against the motion, the State relied almost entirely on the fact that each of the jurors had stated that the discussions about the defendant having access to their personal information did not play a part in the verdict. In denying the motion for mistrial, the trial court also relied on the fact that the jurors assured the court that concerns about Wilding having access to their personal information played no part in the verdict.[3]
The trial court clearly erred by asking the jurors whether the expressed concern factored into their decision-making process and by relying on their assurances as a basis for denying Wilding's motion for mistrial. See § 90.607(2)(b), Fla.Stat. (1993); Powell v. Allstate Insurance Co., 652 So.2d 354, 356-57 (Fla.1995); Keen v. State, 639 So.2d 597, 599 (Fla.1994); Baptist Hospital of Miami, Inc. v. Maler, 579 So.2d 97, 101 (Fla. 1991). Any inquiry into juror misconduct *118 must be limited to objective demonstration of overt acts committed by or in the presence of the jury or jurors which reasonably could have affected the verdict. Powell, 652 So.2d at 356; Maler, 579 So.2d at 101; State v. Hamilton, 574 So.2d 124, 128-29 (Fla.1991). Much like the open discussion of racial bias by jurors that occurred in Powell, a discussion among jurors about their fear that the defendant may have access to their personal information is an "overt act" that may be a proper subject of inquiry.
Like racial bias, if an individual juror fears that the defendant might have access to the juror's personal information, such concern inheres in the verdict and is not the subject of inquiry. However, when such concern is discussed by jurors or otherwise openly brought to the attention of other jurors, the concern becomes an overt act of misconduct that may be inquired into. Powell, 652 So.2d at 357. As in any case dealing with jury misconduct, proper inquiry is limited to objective facts, such as whether the matter was discussed by or brought to the attention of other jurors, when this occurred, and the number of jurors involved.
It was apparent from the sworn statement of the court employee who took the phone call that jurors had shared their concerns about the defendant and that there was a reasonable possibility that the verdict may have been affected. Once this initial showing of juror misconduct was made, inquiry of the jurors was proper. Maler, 579 So.2d at 100. When the juror misconduct was confirmed in the juror interviews, Wilding was entitled to a new trial unless the State could demonstrate that there was no reasonable possibility that the misconduct affected the verdict. Powell, 652 So.2d at 357; (Maler, 579 So.2d at 100 n. 1).
Here, the State failed to prove through objective facts that the misconduct was harmless beyond a reasonable doubt. As explained above, a finding that there was no reasonable possibility that the misconduct affected the verdict cannot be based on improper inquiry into the jury's decision-making process. Keen, 639 So.2d at 599-600. Thus, it was an abuse of discretion for the trial court to refuse to grant Wilding a new trial. Hamilton, 574 So.2d at 126.
Even if reversal were not required because of jury misconduct, reversal would be necessary because of two other errors that occurred in this trial. First, we agree that it was error to admit testimony that the lead detective in the murder investigation received an anonymous tip that named Neil Wilding in connection with the murder.
During direct examination of the detective, the prosecutor asked whether the anonymous tip received by the detective gave the name Neil Wilding. The detective was allowed, over objection, to answer that it did. The detective further testified that the department began its investigation of Wilding from the tip and "verified a lot of the information that we received in the tip and developed additional information." The detective went on to explain that the police interviewed Wilding's family and friends.
The State maintains that this testimony was properly admitted because, given the fact that it took four years to arrest Wilding for the murder, the testimony was relevant "to show the logical sequence of events regarding the murder investigation." We cannot agree.
While it might have been permissible to allow the detective to testify that police began the investigation because of a "tip" or "information received," this testimony clearly went beyond that authorized in State v. Baird, 572 So.2d 904 (Fla.1990). In Baird, we held that it was error for an investigator to testify that he received information that the defendant, who was on trial for racketeering and bookmaking, was a major gambler and operating a major gambling operation in the area. We explained:
[W]hen the only purpose for admitting testimony relating accusatory information received from an informant is to show a logical sequence of events leading up to an arrest, the need for the evidence is slight and the likelihood of misuse is great. In light of the inherently prejudicial effect of an out-of-court statement that the defendant engaged in the criminal activity for which he is being tried, we agree that *119 when the only relevance of such a statement is to show a logical sequence of events leading up to an arrest, the better practice is to allow the officer to state that he acted upon a "tip" or "information received," without going into the details of the accusatory information.
572 So.2d at 908.
We recognize that the information received in the tip in this case was not detailed to the jury to the same extent as was the information received in Baird. However, similar evils are involved in both cases. As noted by the Third District Court of Appeal in Postell v. State, 398 So.2d 851, 854 (Fla. 3d DCA), review denied, 411 So.2d 384 (Fla. 1981) (footnote omitted), where "the inescapable inference from testimony [concerning a tip received by police] is that a non-testifying witness has furnished the police with evidence of the defendant's guilt, the testimony is hearsay, and the defendant's right of confrontation is defeated, notwithstanding that the actual statements made by the non-testifying witness are not repeated."
In this case, even though the detective never specifically repeated what the informant told him, the clear inference to be drawn from the testimony was that the informant had implicated Wilding in the murder and the information received was reliable because it had been verified by police who talked to Wilding's family and friends. Thus, the jury was led to believe that an unidentified person, who did not testify and was not subject to cross-examination, had given the police evidence of Wilding's guilt, evidence that upon investigation proved to be reliable. Even if the testimony was offered simply to show the logical sequence of events regarding the murder investigation, its probative value clearly was outweighed by its prejudicial effect. As a general rule, the investigation leading to the defendant's arrest is not at issue in a criminal trial. Placing information before the jury that a non-testifying witness gave police reliable information implicating the defendant in the very crime charged clearly could affect the verdict. More importantly, because Wilding could not cross-examine the unidentified witness, admission of this testimony violated his confrontation rights.
Unlike the testimony relating the information received from the informant in Baird, this testimony was not merely elicited prematurely. Baird, 572 So.2d at 908 (it was error to admit testimony relating information received from informant because the testimony was elicited before State's motive for investigating defendant was put in issue on cross-examination). In this case, the only issue the testimony could have gone to other than to establish the sequence of events leading to the investigation was Wilding's identity as the killer.
Moreover, almost immediately after the testimony concerning the steps taken to verify the anonymous tip, the detective testified that in an attempt to locate Wilding, the department "secured air time with America's Most wanted." Defense counsel immediately objected, moved for a mistrial, and pointed out that the fact that Wilding had been the subject of an "America's Most Wanted" episode had been the subject of a motion in limine. The fact that Wilding was the subject of this widely viewed television program clearly was irrelevant and highly prejudicial.
When this error is considered in combination with the testimony about the anonymous tip linking Wilding to the murder, neither error can be considered harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986). This is particularly true in light of the fact that members of the jury were already discussing their concern about Wilding, whom they now knew had been the subject of "America's Most Wanted," having access to their personal information. Thus, on this record, we cannot say that there is no reasonable possibility that these errors affected the verdict. DiGuilio.
Accordingly, we must vacate the convictions and sentences and remand for a new trial.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] The trial court found two aggravating factors: 1) the murder was committed while the defendant was engaged in the commission of or attempt to commit a sexual battery and a burglary; and 2) the murder was especially heinous, atrocious or cruel. Although the court found no statutory mitigating factors, it found five nonstatutory mitigating factors: 1) Wilding was physically and emotionally abused by his stepfather as a child; 2) Wilding had a rural upbringing; 3) Wilding had a good employment background; 4) Wilding's jail conduct was good; and 5) Wilding had potential for rehabilitation.
[2] Wilding raises the following claims: 1) the trial court erred in admitting hearsay evidence concerning an anonymous tip received by police; 2) Wilding was denied due process and a fair trial due to the prosecutor's misleading argument concerning DNA evidence; 3) the trial court erred in restricting Wilding's cross-examination of a key state witness; 4) the trial court erred in denying Wilding's motion for judgment of acquittal to the charge of sexual battery; 5) it was error to adjudicate Wilding guilty of a crime not charged; 6) admission of DNA evidence violated Wilding's right to due process and a fair trial; 7) Wilding was entitled to a new trial because his right to a fair and impartial jury was violated; 8) the trial court erred by allowing the State to present evidence of what occurs in other cases; 9) the indictment was constructively amended contrary to the grand jury clauses of the Florida and United States Constitutions; 10) the trial court erred in allowing the State to proceed on a theory of felony-murder; 11) the trial court erred in denying Wilding's motion for mistrial where testimony that Wilding was the subject of "America's Most Wanted" was introduced; 12) Wilding was entitled to release or in-camera review of the grand jury testimony; 13) there was insufficient evidence that the DNA evidence presented to the jury came from the crime scene; 14) the trial court erred in finding the especially heinous, atrocious or cruel aggravating circumstance; 15) the prosecutor's comments to the jury during the penalty phase of the trial deprived Wilding of due process and a fair and reliable sentencing; 16) it was error to introduce nonstatutory aggravating circumstances during the penalty phase; 17) death is not proportionately warranted; 18) the trial court erred in refusing to allow Wilding to argue that there is an initial presumption of life; 19) the trial court used the wrong standard to reject Wilding's drug abuse as a mitigating circumstance; 20) Wilding was denied due process and a fair sentencing due to the trial court's receipt of nonstatutory aggravating information; 21) the trial court erred in instructing the penalty-phase jury on sexual battery; 22) the trial court gave undue weight to the jury's recommendation; 23) the trial court gave an erroneous instruction of the aggravating circumstance of especially heinous, atrocious, or cruel; 24) the trial court erred in instructing on the requirement of "extreme" mental or emotional disturbance and "substantial" impairment; 25) the trial court failed to file a written sentencing order contemporaneous with the pronouncement of sentence; 26) the trial court erred during the penalty phase by refusing to allow Wilding to challenge the State's version of his guilt; 27) the trial court erred by admitting hearsay evidence during the penalty phase; 28) the felony-murder aggravator is unconstitutional; 29) the trial court erred by failing to adequately define nonstatutory mitigating factors; 30) the trial court erred in refusing to instruct the jury that mitigating evidence does not have to be found unanimously; and 31) the aggravating circumstances found in this case are unconstitutional.
[3] The court expressly found that it was clear that some of the jurors were concerned about Wilding having their personal information but "none of these jurors allowed that concern to play any part in their decision that they arrived at in the guilt or innocence phase in this trial."