NESBITT, Judge.
Maggie Carr was charged with first-degree murder for the highly publicized killing of British businessman Howard Bates. Her first trial resulted in a mistrial. In this, her second trial, the lower court took precautions to ensure that the jury was not prejudiced by publicity. Specifically, the court and parties were aware that Carr had been featured on the television show “America’s Most Wanted.” Eventually, the parties agreed no reference to the show would be made, and any mention of the show in the evidence to be submitted would be redacted.
After her arrest, in a largely exculpatory transcribed statement, Carr indicated that although she knew of Bates’ murder, her knowledge was obtained after the fact. Handwritten on page 45 of her statement was the following:
I made this statement because I’m not the bitch and animal I was portrayed as in America’s Most Wanted. I want to make things right and assist in any way I can.
This portion of her statement was redacted by agreement and excluded from evidence.
During deliberations, by clerical error, Carr’s unredacted original statement, containing the “America’s Most Wanted” refer-' ence was sent to the jury. Standing five feet or so from the door to the jury room, the court reporter and clerk heard the term “America’s Most Wanted” being spoken, realized they were missing certain materials, and retrieved them.
In cases in which unauthorized materials have been taken into the jury room, a court must not inquire into matters relating to jurors’ thought processes at an evidentiary hearing on whether presence of the materials was prejudicial. Here, post-verdict, in accord with State v. Hamilton, 574 So.2d 124 (Fla.1991), the trial judge properly conducted an inquiry limited solely to the observable events surrounding the presence of the unauthorized material in the jury room. The testimony taken revealed that the jury had seen and discussed the handwritten reference to America’s Most Wanted.
On the basis of the jury’s access to the unredacted statement, the defense moved for a mistrial, arguing that the jury had discussed the prejudicial comment only an hour before rendering their verdict. The state agreed to the granting of the mistrial, conceding there was a presumption of prejudice. The trial judge, however, concluded that the only thing that could be learned from the “America’s Most Wanted” reference was that Carr had been a fugitive, a fact the jury already knew. The judge determined that while the clerk had made a mistake, the error was not a ground for mistrial. Carr was found guilty of first-degree murder. This appeal followed.
On appeal, Carr again argues that the statement erroneously submitted to the jury mandates reversal. The state answers that when it agreed to a mistrial, it had been under the misconception that the jury had also seen a news article not in evidence. The state maintains that permitting the jury to *285 see defendant’s unredacted comment, standing alone, was harmless error.
At issue is whether the error in permitting the jury to see Carr’s reference to “America’s Most Wanted” was harmless beyond a reasonable doubt. Carr relies on Wilding v. State, 674 So.2d 114, 119 (Fla.1996), a case where the jury heard testimony that the police department had “secured aü time with America’s Most Wanted,” a matter which was the subject of a motion in limine. The Supreme Court deemed the testimony irrelevant and highly prejudicial. The court, however, considered the error in Wilding “in combination with the testimony about an anonymous tip linking [defendants] to the murder” and concluded neither error could be considered harmless beyond a reasonable doubt. Id. Thus, Wilding is not determinative of the proper resolution of the instant error standing alone.
As observed in State v. DiGuilio, 491 So.2d 1129 (Fla.1986), the harmless error test, as set forth in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict. DiGuilio, 491 So.2d at 1135.
As DiGuilio observed:
The test is not a sufficiency of the evidence, a correct result, a not clearly wrong, a substantial evidence, a more probably than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.
DiGuilio, 491 So.2d at 1139.
The evidence at trial was no doubt overwhelming. Carr was hired as an accountant for Bolden, Inc., a company supposedly making surgical gowns and drapes. With company founder Alex Lueio’s approval, Carr quickly assumed full financial responsibility, and in a short time was running the business. Carr wrote checks to whomever she pleased, including herself, and hired as employees various members of her family. The victim, Bates, having made a million dollar investment in Bolden, began to worry about his investment and hired a forensic accountant to review Bolden’s records. The accountant soon concluded that there were no records and no inventory, and with Bates’ approval began a full audit, quickly suggesting Carr be replaced.
Lucio testified that as a result of Bates hiring accountants and lawyers, he and Carr wanted Bates dead. Lucio testified that to that end, he and Carr hatched a plan where Lucio would fly to England and kill Bates. A friend of Carr’s, James Luge, testified that during this time, Carr told Luge that she wanted to purchase a gun “off the streets.” The state contended that Carr had obtained a gun, packed it, and shipped it to Lucio, who had flown to England. Carr maintained she had shipped a package to Lucio in England but was unaware of its contents. At the last minute, Lucio found he could not go through with the plan, and instead, informed Bates a purchaser for his interest in Bolden had been found. Lucio’s testimony was that upon his return to Bolden, Carr informed him that he was not dealing with the problem and that something had to be done. To that end, the two implemented a second murder plan.
Bates was lured to company headquarters ostensibly to meet the potential buyer. In the meantime, according to the testimony of Lucio and Wayne Merced, Carr’s ex-fiance, Carr contacted Merced, who still was in love with Carr, and told Merced to come to Bol- *286 den and bring a gun. When Merced appeared, Lucio explained they were having trouble with an investor and they wanted Merced to get rid of him. Merced testified Carr asked him directly whether he was going “to do this thing or am I going to have to do this thing?” Merced agreed to commit the murder.
Merced hid in a small dark storage room as Lucio instructed. Lucio entered the room with Bates, and Merced shot Bates. Merced testified that at this point he tried to leave, but Carr and Lucio told him he could not, Carr commenting, “Wayne, you idiot, he’s still alive. Shoot him again.” Merced fired a second time and the two again told Merced he could not yet leave, as they still needed his help. Lucio went to get something to wrap Bates’ body and Carr got a mop to clean up the blood. The three eventually put the body in Lucio’s car. Additionally, while Bates’ body was being wrapped up, Carr took the money and a credit card out of Bates’ pocket. Carr eventually used the card at a number of local shops.
According to Lucio, two days later, Lucio and Carr drove to a remote area, dug a hole in the ground and buried Bates. Carr eventually admitted to police that she had used Bates’ credit card. The police investigation of the murder lasted two years. When Can1 was indicted, she fled the country. Upon her return to Miami, she was arrested for Bates’ murder. Carr’s testimony was that she was not involved in the murder plan but learned of it only after the fact.
Carr said she knew Merced was at Bolden the day of the killing, however it was only after the murder, that Lucio told her that he had asked Merced to help eliminate Bates. According to Carr, she had run from her office to the crime scene when she heard shooting. It was only then that she observed Bates shot. Shortly thereafter, in her presence, Merced shot Bates again. Carr recalled observing a lot of blood at the scene and hearing another shot. Carr did not dispute that she helped mop up the blood soaked room. Lucio and Merced carried Bates’ body out to a car. Carr admitted holding the door open for them. Carr stated that she had later used Bates’ credit card only because Lucio had instructed her to do so.
It was the final passage of her formal statement, by agreement of the parties redacted, which was accidentally placed in the jury room, and forms the basis of this appeal. Here, in the redacted passage, Carr stated that she had made her statement because of the inaccurate portrayal of her on “America’s Most Wanted.” The statement supported Carr’s claim of innocence and elucidated no more than that she had made a statement in order to protect and clear her good name. From the statement the jury discovered only that Carr had denied liability in response to an unfavorable portrayal on the television show. No doubt, the error certainly did not constitute a substantial part of the prosecution’s case.
Considering the evidence properly before the jury, as well as the statement improperly submitted to the jury, we conclude that beyond a reasonable doubt the error complained of did not contribute to the verdict. As the trial judge pointed out, the jury already knew Carr had been a fugitive. Carr’s statement was that she had attempted to vindicate herself by clarifying that she was not as she had been depicted. We find there is simply no reasonable possibility that statement contributed to the guilty verdict ultimately rendered.
Accordingly, because we conclude the verdict in this case was not substantially swayed by the error which occurred, we affirm the order under review.