SILBERMAN, Chief Judge.
Ronnie Tremel Walker seeks review of his judgment and sentence for manslaughter, armed burglary of a dwelling with an assault or battery, and armed robbery. We reverse and remand for a new trial because the trial court erred in admitting hearsay evidence that an unnamed third party had provided information that led to Walker’s identification.
In October 2003, Raymond Lee was living with his girlfriend of fifteen years, Elaine, and Elaine’s nine-year-old granddaughter, Veronica. On the evening of October 23, 2003, Raymond and Veronica were in the den when a man they had never seen before appeared with a handgun. He held his finger to his lips to quiet Raymond and Veronica.
The man patted down Raymond and took his wallet from his back pocket. Although the wallet contained about $500, the man asked Raymond where he kept the rest of his money. When Raymond asked what he was talking about, the man asked who else was in the home. Raymond told him that Elaine was in the *892 master bedroom. The man then grabbed Raymond around the neck with one arm, grabbed Veronica with the other, and hustled them into the master bedroom while pointing the gun at Raymond’s head.
When Elaine saw the man holding Raymond and Veronica at gunpoint, she started screaming. The man became agitated and told Elaine to be quiet. Raymond could see that the man was panicking and told Elaine to calm down. Elaine continued screaming, and the man pointed the gun at her and told her to shut up. Raymond tried to grab the gun while the man told Elaine, “I’m not gonna tell you to shut up no more.” The man fired the gun, and Elaine fell. Veronica then started screaming.
The man turned to Raymond and said Raymond had until the count of three to tell him the location of the money or Veronica would be shot. When Veronica started panicking, the man knelt down, kissed her on her forehead, and said, “I’m not going to shoot you because I have a daughter myself. Just tell me where the money is at.” When Raymond insisted that there was no more money, Veronica blurted, “[I]t’s in the trunk.”
The man ushered Raymond and Veronica to the living room and demanded the car keys. Raymond told the man the keys were hanging on the wall. They retrieved the keys and proceeded outside. Raymond had parked his two cars on his neighbor’s property to hide them because he sometimes used the cars to store drugs. They tried to open the trunk of one of the cars, but the keys would not fit. When the man asked again about the keys, Raymond said the keys were in the car. The man had Veronica retrieve them and open the trunk.
After she opened the trunk and looked inside, Veronica remarked, “I don’t see no money.” Raymond took the opportunity to grab the man’s arm, and the gun fell to the ground. As the two men struggled, Raymond yelled for Veronica to run. Veronica took off. The man then retrieved the firearm and took off running in the other direction. Raymond fled in the direction Veronica had run and called for help.
Sergeant Haggart heard a radio call regarding the home invasion at 8:15 p.m. and responded to the scene. He entered the house and found Elaine lying on the bed. She had been killed by a gunshot wound to her head. Raymond described the perpetrator as a twenty-five-year-old black male, 5'10" to 5'11" tall, weighing about 185 pounds. The man was wearing a baseball cap, and the only distinctive feature Raymond could remember was a scar running down the left side of the man’s face. The police showed Raymond two photopaks, each containing six pictures of suspects. Raymond did not identify anyone from the photopaks.
About a month after the shooting, Raymond received information “from the streets” as to the perpetrator’s identity. Raymond went to his sister Valerie’s home and called his sister Yolanda. Yolanda researched a state database while Raymond was on the phone. She searched the database for younger black males with a first name that began with the letters “R-o-n” and pulled up about ten photographs of possible perpetrators. Valerie then pulled up the photographs on her computer. Raymond identified Walker from one of the photographs.
Raymond contacted the detective who was assigned to the case, Detective Dra-biniak, and informed him that he had the name and photograph of the perpetrator. Drabiniak pulled up the photograph on the website and then prepared a photopak us *893 ing a different photo of Walker. Raymond identified Walker’s photograph.
Of the nineteen prints taken at the scene, only one palm print from an ar-moire in the master bedroom was detailed enough to compare to existing prints. However, it did not match Elaine, Raymond, or Walker. Additionally, the police never recovered the firearm the perpetrator used. Because the only evidence against Walker was Raymond’s identification of his photographs, Detective Drabin-iak decided not to arrest Walker and continued the investigation.
But the case went cold. Five years later, the case was transferred from Detective Drabiniak to Detective Massucci for a cold case review. Detective Massucci arranged for a DNA analysis of an area of blood at the scene that had not been tested in the first investigation. Ultimately, all of the DNA was matched to Elaine and Raymond, who had cut his finger during the incident.
Detective Massucci interviewed Walker in July 2009. Massucci informed Walker of the evidence against him and accused Walker of committing the crimes. Walker calmly responded, “[S]ounds like you have a tight case, but that’s not my M.O.” Walker also attempted to explain why the evidence did not necessarily establish that he was the perpetrator. Because Walker continued to deny his involvement, the detective decided to try a different tack. He attempted to appeal to Walker’s emotions by mentioning the perpetrator’s tender treatment of nine-year-old Veronica when she became upset. Walker teared up, and the detective encouraged him to confess. Walker responded, “I know what you’re saying but I will never tell on myself.” Detective Massucci continued the interview, but Walker never admitted that he had committed the crimes. Walker was arrested in September 2009.
In February 2010, Walker was tried for first-degree felony murder, armed burglary of a dwelling with an assault or battery, and armed robbery. This trial resulted in a hung jury, and the court declared a mistrial. The State then amended the murder charge to second-degree murder and retried Walker on the three charges.
At the second trial, the State relied primarily on Raymond’s identification of Walker and Detective Massucci’s testimony regarding Walker’s statements during his interview. On cross-examination of Raymond, defense counsel established an inconsistency between Raymond’s identification of the perpetrator’s scar and Walker’s actual appearance. Raymond had described the perpetrator’s scar as a raised scar running down the side of his face, but the only mark on the side of Walker’s face was an acne pockmark that looked like it had been scratched. And, on cross-examination of Detective Massucci, the detective conceded that, even though the perpetrator had told Veronica that he had two daughters, Walker was the father of two sons.
The jury found Walker guilty of the lesser-included offense of manslaughter and of armed burglary and armed robbery as charged. On appeal, Walker argues that he is entitled to a new trial because the trial court erroneously admitted hearsay evidence that an unnamed third party had provided identifying information that led to Raymond’s identification of Walker.
During Raymond’s direct examination, the State established that people in the neighborhood were very upset about Elaine’s death. The following exchange then occurred:
Q. All those people that we just discussed, were people actively trying to get information on the street as to who *894 might have information about who did this?
A. You couldn’t imagine the people who was just trying to find out information further as who did this, because she was just a good, loving person and always loved her kids and her grandkids. Always.
Q. Okay. At some point, did you hear rumors of a name that—
[DEFENSE COUNSEL]: Objection, Your Honor.
THE COURT: Sustained. Next question.
Q. Did you get information from the streets about who potentially did this?
A. Yes, I did.
[DEFENSE COUNSEL]: Objection, Your Honor.
Counsel then approached and argued, “What he heard from the streets is clearly hearsay.” The objection was overruled. Raymond then explained how his sister Yolanda searched the state database and pulled up Walker’s photo. This same information was elicited during Yolanda’s testimony.
Walker argues that this evidence from an unidentified source that Raymond got “information from the streets about who potentially [committed the charged crimes]” was inadmissible hearsay. Walker claims that, even though the exact “information” provided was not disclosed, the inference from this testimony is that some unnamed, unidentified person accused Walker of committing the crimes in this case.
The State responds that the statement was not hearsay because it was not admitted for the truth of the matter asserted but to explain Raymond’s subsequent conduct in looking at photographs online. Alternatively, the State asserts that the error was harmless when considered in light of all the evidence presented. We disagree with both of these assertions.
“[I]t is impermissible for the State to have the benefit of statements from mystery witnesses or sources without the defendant having the right of confrontation and cross-examination.” Keen v. State, 775 So.2d 263, 273 (Fla.2000). To come within this rule, the testifying witness need not repeat the exact statements of the mystery witnesses or sources but need only give testimony from which such statements may be inferred. Wilding v. State, 674 So.2d 114, 119 (Fla.1996), receded from on other grounds, Devoney v. State, 717 So.2d 501 (Fla.1998). Where the inference from a statement of a mystery witness is that the witness has furnished evidence of the defendant’s guilt, the testimony is hearsay and violates the defendant’s right of confrontation. Id.
The Florida Supreme Court has rejected the argument that such statements are admissible to explain the police investigation or to establish a sequence of events. Keen, 775 So.2d at 271. “ ‘[T]he prejudice of out-of-court statements used to relate accusatory information but offered simply to establish the logical sequence of events outweighs the probative value of such evidence, rendering it inadmissible.’ ” Id. (quoting Caruso v. State, 645 So.2d 389, 395 (Fla.1994)).
The facts of this case are analogous to those in Stokes v. State, 914 So.2d 514 (Fla. 4th DCA 2005). In Stokes, the defendant was charged with first-degree murder with a firearm, robbery with a firearm, and aggravated assault with a firearm. Id. at 515. During the State’s direct examination of Detective Shatara, the detective “testified that [the defendant] became a suspect after [Detective] Shatara conducted a number of interviews with other people.” Id. at 517.
The Fourth District determined that this testimony constituted inadmissible hearsay. The court explained that this statement could have caused the jury to *895 infer either “that non-testifying witnesses made accusatory statements to Detective Shatara about the defendant” or “that testifying witnesses gave police information about appellant’s involvement which was not presented to the jury.” Id. The court rejected the State’s argument that the testimony was admissible to explain the sequence of events leading to the defendant’s development as a suspect, noting that the supreme court had expressly rejected such an argument in Keen and Wilding.
In this case, the testimony at issue was that Raymond was given information from an anonymous witness about who potentially committed the crimes. Thus, the statements made by Raymond were inadmissible hearsay. See also Wilding, 674 So.2d at 118-19 (holding that the detective’s affirmative response to a question of whether he received an anonymous tip naming the defendant constituted inadmissible hearsay); Stribbling v. State, 778 So.2d 452, 453-54 (Fla. 4th DCA 2001) (holding that investigating detective’s testimony that he first obtained information about the perpetrator of the crime the day after the murder when he received a phone message leaving the defendant’s name constituted inadmissible hearsay).
The State’s argument that any error in admitting these statements was harmless is without merit. The identifying information by the unknown third party was mentioned several times during the trial. First, Raymond testified about the statement. Then Raymond’s sister Yolanda testified about the statement, specifically mentioning that the tip was that a black man named Ron committed the crimes. And finally, the State mentioned the “information from the streets” in its closing argument to suggest that Raymond properly identified Walker as the perpetrator.
Moreover, the evidence against Walker was tenuous because there was no physical evidence connecting Walker with the crimes and his identification was significantly impeached. Furthermore, some of the evidence was actually inconsistent with Walker’s being the perpetrator. The perpetrator had told the nine-year-old victim that he had two daughters at home, but Walker has sons. And while Walker’s fingerprints were not found at the scene, a palm print of an unidentified third party was found. Finally, while the State asserted that Walker made inculpatory statements during his interview, he did not admit to committing the crimes or offer any information regarding the crimes.
Under these circumstances, it cannot be said that the error in admitting evidence that one or more persons from the streets had identified Walker as the perpetrator did not affect the verdict. See Stribbling, 778 So.2d at 455 (rejecting harmless error argument for anonymous hearsay identification evidence because identification was in question). Accordingly, we reverse and remand for a new trial.
Reversed and remanded.
KELLY and LaROSE, JJ., Concur.