NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

| | |
|---|---|
| DION ALAN KASETA, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) Case No. 2D12-6431 |
| | ) |
| STATE OF FLORIDA, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Opinion filed June 3, 2016.

Appeal from the Circuit Court for Polk
County; J. Dale Durrance, Judge.

Lee Adam Cohen, Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Wendy Buffington,
Assistant Attorney General, Tampa,
for Appellee.


NORTHCUTT, Judge.


        Almost a decade after Kimberly Mimmovich went missing a grand jury

indicted her boyfriend, Dion Kaseta, for her murder.  The State eventually filed an

amended information charging Kaseta with manslaughter and a jury found him guilty of

that crime. We conclude that Kaseta's conviction was marred by an evidentiary error that requires a new trial.

At Kaseta's November 2012 trial, all agreed that late on the evening of December 8, 2001, he drove from the couple's mobile home in Polk County to the home of his sister and brother-in-law in Deerfield Beach, on Florida's southeast coast, arriving early on the morning of December 9. In interviews with law enforcement at the time and two years later Kaseta recounted that he and Mimmovich made the trip together. Kaseta said that the two had decided on impulse to go to the beach. They considered driving north to Daytona Beach but settled on Deerfield Beach to the south so that Mimmovich could meet Kaseta's family.

According to Kaseta, he and Mimmovich drove overnight and arrived the next morning too early to disturb his relatives. Their house was several blocks from the Atlantic Ocean, and Mimmovich wanted to wait on the beach to see the sunrise. Kaseta dropped her there, watched her walk toward the beach on the catwalk that extended over the dune line, and drove to his sister's house to wait outside until an acceptable time to waken the household. He never saw Mimmovich again. He does not know her whereabouts or whether she is alive or dead.

The State's theory was simple and straightforward: on the evening in question Kaseta killed Mimmovich during an altercation in their mobile home, then disposed of her body somewhere along his route to Deerfield Beach. But the evidence to support that scenario was meager. The State's proof was entirely circumstantial and none of it was forensic; luminol-assisted examinations of the couple's mobile home,

-2-

Kaseta's car, and a boat he used to go fishing in Deerfield Beach failed to turn up blood or any other indicia of mayhem.

By and large, the other circumstances advanced by the State were as consistent with Kaseta's version of events as not. We need not detail them all, but an example is that Mimmovich's favorite "Goofy" watch was found on her nightstand after her disappearance, the State's theory being that she would not have left without it. On the other hand, Mimmovich owned several of these watches and it would have been reasonable for her to take another rather than risk the loss or destruction of her favorite on a beach outing. Most of the circumstances relied upon by the State were of similar caliber.

On appeal Kaseta makes a credible argument that the trial court should have granted his motion for judgment of acquittal because the State's circumstantial evidence failed to exclude his reasonable theory of innocence and therefore it was legally insufficient to convict him. See Hodgkins v. State, 175 So. 3d 741 (Fla. 2015). But we conclude that the court properly submitted the case to the jury, owing to evidence of two circumstances that were truly inconsistent with Kaseta's theory.

First, a friend of Mimmovich's, Cynthia Ketchum, testified that on the evening of December 8 Mimmovich asked Ketchum to cut her hair sometime the next day. When Ketchum did not hear from Mimmovich on the ninth, she tried calling several times. On one of those occasions, Kaseta answered Mimmovich's cell phone and said that she wasn't there. This differed from the testimony of a Broward County sheriff's deputy who recounted that when Kaseta reported Mimmovich missing he said that she

-3-

was carrying her purse, which contained her cell phone and money, as he watched her cross the catwalk to the beach early that morning.

Second, a couple who lived next door to the mobile home, David Money and Sharon Allen, testified that late on the evening of December 8 they heard Kaseta and Mimmovich in the throes of a violent argument. They described sounds of stomping and yelling and a loud bang, as if a dresser or some such had been slammed against a wall. Several days later, Money testified, Kaseta asked him if he had seen Mimmovich and told him that she was missing. According to Money, Kaseta said that he and Mimmovich had argued before she left to walk on the beach. These recollections differed markedly from Kaseta's statements to law enforcement, in which he acknowledged that the couple had a mild disagreement but described an otherwise enjoyable evening preceding their abrupt decision to go to the beach, and in which he made no mention of an argument before he dropped Mimmovich at the catwalk.

Insofar as those circumstances contradicted Kaseta's theory of defense, they justified denying his motion for judgment of acquittal. See Jackson v. State, 180 So. 3d 938, 950 (Fla. 2015), cert denied, Jackson v. Florida, 2016 WL 866707 (2016). But as proof of Kaseta's guilt, they were far from conclusive. Cynthia Ketchum's cell phone call, recollected over a decade later, easily could have been explained as a mistaken conflation of memories from other occasions. Further, a Polk County sheriff's cold case detective testified that the family gave him the contents of Mimmovich's purse when he began investigating the case in 2010. If so, Mimmovich could not have taken the purse with her when she walked to the beach; it was possible that the Broward

-4-

deputy who took the missing person report at the time simply misunderstood what Kaseta said.

The next-door neighbors' claims to have heard Kaseta and Mimmovich arguing the night before Mimmovich vanished were dubious, as well. Both of these witnesses were convicted felons; Allen acknowledged that she had fifteen convictions for crimes of dishonesty and that there were felony charges pending against her at the time of trial.

Beyond that, a significant aspect of their story made little sense. In the days following Mimmovich's disappearance, the Moneys observed Polk County sheriff's crime scene personnel processing the Kaseta-Mimmovich residence. Yet they did not bother to walk next door and volunteer their information. And although they knew that Mimmovich went missing in Broward County, they did not contact law enforcement in that jurisdiction, either. Rather, they claimed to have made the curious decision to report what they knew to the Federal Bureau of Investigation. Allen testified that she telephoned and reached a receptionist or secretary at the FBI who took a message and promised that someone would contact them to take a statement. No one ever did.

Money also claimed that within the week after Mimmovich disappeared, he related what he and Allen knew to Mimmovich's father, Veatrice Bumbalough. But if that were true, for some unfathomable reason Bumbalough never mentioned this information to law enforcement. This was despite the facts that Mimmovich's family members were interviewed by investigators and that the family was so concerned about her welfare that they had driven to Deerfield Beach in search of clues to her

whereabouts. Neither, apparently, did Bumbalough bother to relate Money's information even to his wife, Dorothy, who kept a journal of significant facts and events related to her daughter's disappearance. By the time of trial, Mrs. Bumbalough was suffering the early stages of dementia and memory loss, and so pertinent passages of the journal were published to the jury under the recollection recorded exception to the hearsay rule. There was no mention of Money's statements to her husband about hearing an altercation. Bumbalough died several years after his daughter went missing.

The law enforcement investigation into Mimmovich's disappearance remained stagnant for nearly nine years. Then, in the summer of 2010, the Polk cold case detective visited the Moneys and interviewed them about what they had observed on the evening of December 8, 2001. Seemingly, this interview was the crucial break in the long dormant case—Kaseta was indicted within a month of it. And, ironically, how the interview came about was the nub of the error that tainted Kaseta's trial.

According to the detective, in July 2010 he received a telephone call from Mimmovich's sister, Debbie Mellon. Mellon told him that her other sister, Julie Martin, recently had mentioned that their late father had told her something about the neighbors possibly having some information about Mimmovich's disappearance. The detective reviewed the file and discerned that the Moneys had never been interviewed, so he went to talk to them.

Mellon testified that she called the detective "[b]ecause me and my sister was talking, Julie, was talking one day and she remembered Daddy saying something about the Moneys, what they had told him." According to Mellon, she then visited the

-6-

Moneys before the detective interviewed them because she wanted to confirm that they still lived there and would be willing to talk to the police. Notably, Mellon testified that she first met the Moneys just after Mimmovich went missing. But apparently they said nothing to her at that time about the fight they claimed to have heard.

After Mellon testified, the State called Julie Martin as a witness. Over defense counsel's strenuous hearsay objection, the trial court permitted Martin to testify that, within a few days after her sister went missing, her father related to her that Money told him there was a disturbance at the mobile home on the evening of December 8. Martin did not tell this to the police at the time, even though they interviewed her and the rest of the family. But almost nine years later, in the summer of 2010, she disclosed her father's statement to her sister, Mellon, and she wondered whether the information had ever been followed up. She asked Mellon to call the sheriff's detective and tell him about it.

If the Moneys' claims to have heard violence in the Kaseta-Mimmovich residence were doubtful, the sisters' stories perhaps were even more far-fetched. If their testimony was to be believed, during an ongoing police investigation into the disappearance of his daughter, Veatrice Bumbalough learned that she had a loud, physically violent fight with her boyfriend the very night before she went missing. Bizarrely, however, he disclosed this to no one other than Martin, who herself—just as bizarrely—did not mention it to family or law enforcement for eight and a half years. If, as the sisters claimed, they wondered whether the alleged fight had been followed up by the investigators, they must have known that the police had never been told about it;

-7-

otherwise, why would they question whether the police had looked into it? Indeed, the sisters must have known not only that their father had withheld the information from investigators but that the Moneys had done so as well. How did they know that? When Martin asked Mellon to tell the detective what the Moneys had heard, she must have known that the Moneys had never related their story to the police or to anyone else who would have alerted authorities. How? And knowing this, why did she wait so many years to bring it up to Mellon or to the police? Why did Mellon think it necessary to visit the Moneys to ascertain that they still lived there and would be willing to talk to the police—isn't that what detectives do? And her effort would have been pointless if it turned out that the Moneys had long ago talked to the police and described the altercation they claimed to have heard on December 8, 2001. It is hard to fathom that Mellon would have gone to the trouble unless she already knew that the Moneys' story had never before been told to the police. But how did she know that?

The sisters' story was highly suspect, to say the least. But it likely convicted Kaseta, for it corroborated and thus bolstered the only evidence, similarly suspect, that just before Mimmovich disappeared Kaseta had a motive and opportunity to kill her, and that he lied to the police about it. And it was the admission of this tale that compels us to reverse Kaseta's conviction.

Specifically, the trial court erred when it permitted Martin to relate what her father told her. There is no doubt that the out-of-court statements Martin described fell under the basic definition of hearsay. See § 90.801(1)(a), Fla. Stat. (2010). Indeed, Martin's testimony constituted double hearsay from two declarants—Money made a

statement to Veatrice Bumbalough, and Bumbalough repeated the statement to his daughter. Accordingly, each statement had to fall under a valid hearsay exception to be admissible. See Henderson v. State, 135 So. 3d 472, 476 (Fla. 2d DCA 2014); see also § 90.805, Fla. Stat. (2010). Money's alleged statement to Bumbalough might have been admissible to rebut an express or implied charge of recent fabrication under section 90.801(2)(b), Florida Statutes (2010)—if Bumbalough had testified to it in court. But Bumbalough's out-of-court statement to Martin was not admissible under any exception to the hearsay rule.

At trial the State contended that Martin's testimony was not inadmissible hearsay because it was not offered for the truth of the matter asserted. Instead, the prosecutor said, its purpose was "for the jury to understand how . . . Money [and Allen] came to the attention of law enforcement in 2010." The court accepted this assertion, which was fallacious in two respects. First, the detective and Mellon had already explained how the detective learned of the Moneys' story. Consequently, Martin's hearsay testimony was not necessary for the purpose the State put forward.

But, more to the point, this supposed purpose of Martin's testimony simply was not relevant. The court in Keen v. State, 775 So. 2d 263 (Fla. 2000), considered a similar circumstance. As here, the prosecutor in Keen contended that hearsay evidence was not elicited for the truth of the matter asserted but rather was intended to show the sequence of events that led to an investigation. Keen stated that such a sequence was not a material issue, and "there is no relevancy for such testimony to prove or establish a nonissue." Id. at 274. Simply because the State clothes the evidence with a

-9-

nonhearsay label does not change its characteristics when its only relevance is to prove the truth of what the speaker said. Id. (citing Wright v. State, 586 So. 2d 1024 (Fla. 1991), for the proposition that "where the only relevance of an out-of-court statement is to prove the truth of the matter asserted it is hearsay and is not rendered admissible when the non-hearsay purpose is not relevant").

Given the paucity of the State's evidence even that Mimmovich is dead, let alone that Kaseta killed her, we easily reject the State's assertion that permitting Martin's improper testimony was harmless error. To the contrary, Kaseta's conviction may well have unfairly turned on it. See Walker v. State, 77 So. 3d 890, 895 (Fla. 2d DCA 2012). For this reason, his conviction must be set aside.

Reversed and remanded for a new trial.

KELLY, J., Concurs in result.
VILLANTI, C.J., Concurring in part and dissenting in part.

VILLANTI, Chief Judge, Concurring in part and dissenting in part.

I concur in the majority opinion affirming the trial court's decision denying Kaseta's motion for judgment of acquittal because the direct and circumstantial evidence was not insufficient as a matter of law to take the question of guilt away from the jury. See State v. Odom, 862 So. 2d 56, 59 (Fla. 2d DCA 2003). However, I respectfully dissent from the remaining portions of the majority decision, especially its decision to order a new trial without certain testimony.

-10-

I specifically disagree with the majority's decision to exclude testimony from the victim's sister, Julie Martin, that her father had told her about a fight between Kaseta and the victim that he had learned of from the victim's neighbors for four reasons. First, it was not "double" hearsay, or any other form of hearsay for that matter, as opined by the majority. This testimony was not offered to prove the truth of the matter asserted, but to explain the sequence of events that resulted in a cold case being solved. It ultimately explained the recent developments that led to local law enforcement deciding to interview neighbors David Money and Sharon Allen, who had heard the disturbance between the victim and Kaseta that occurred at the victim's residence the night she disappeared. When Julie Martin recalled her father telling her that he had heard about this fracas from the neighbors, that recent recollection, and not fabrication, was what precipitated her providing her sister Debbie Mellon with this information to take to the police. And once armed with this "new" information, the police reopened the case; as the saying goes, the rest is history. The use of these statements for the purpose of clarifying exactly <u>why</u> the police decided to interview Money and Allen several years after the case went cold does not qualify the statements as hearsay. § 90.801(1)(c), Fla. Stat. (2012) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").

Additionally, Kaseta's chief complaint on this issue is that he was denied the opportunity to cross-examine Julie Martin's father—a gentleman who suffered from memory loss before his demise. But because the complained-of statements were not

-11-

used to prove that the victim and Kaseta were fighting the night the victim disappeared, the trial court did not violate Kaseta's right of confrontation by allowing the statements into evidence. See McWatters v. State, 36 So. 3d 613, 637-38 (Fla. 2010) ("The Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " (quoting Crawford v. Washington, 541 U.S. 36, 60 n.9 (2004))). Thus, Kaseta's inability to cross-examine the father on this point is not a constitutional violation.

Second, Julie Martin's testimony was properly introduced to bolster Money's testimony at trial that he had heard the victim and Kaseta fighting the night the victim disappeared. Prior out-of-court statements are admissible nonhearsay when the declarant testifies at trial and is subject to cross-examination prior to the statement's introduction into evidence, and when the prior consistent statement is offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication. See § 90.801(2)(b); Howard v. State, 152 So. 3d 825, 828 (Fla. 2d DCA 2014). In the present case, Money testified about the fight prior to the State proffering Julie Martin's testimony, and during cross-examination, Money was subjected to questions such as "[i]sn't it correct that you hated my client, Mr. Kaseta?" and "[t]he fact is you didn't like my client, you didn't like him at all, and you did hate him. Isn't that true?" and "it wasn't until 2010 that you come up with this story that, oh, I heard a fight over at that trailer [in] 2010, nine years after Ms. Mimmovich disappeared. Is that correct, sir?" Certainly, these questions could have only been asked to suggest that Money had recently fabricated his version of events. As such, the introduction of Julie

-12-

Martin's testimony regarding Money's prior consistent statements to her father about a fight between the victim and Kaseta the night the victim went missing was not an impermissible use of hearsay to bolster Money's testimony, but was instead a permissible use of nonhearsay to counter the defense's implicit charges of fabrication.

Third, Julie Martin's testimony was duplicative of other testimony admitted without objection. Prior to Julie Martin testifying, Money testified about the fight between the victim and Kaseta and that he had told Julie Martin's father about the fight; Debbie Mellon testified that she visited Money and Allen in 2010 as part of an investigation into the victim's disappearance after Julie Martin "remembered Daddy saying something about the Moneys, what they had told him"; and Allen testified that the police visited her and Money in 2010 after the victim's family members reported information regarding the victim's disappearance that they had learned from Money. In addition, Julie Martin's testimony was brief in nature, the State never argued it for the truth of the content, and there was sufficient other evidence to support Kaseta's guilt. An examination of pertinent undisputed facts bears out that no abuse of the trial court's wide discretion in admitting this testimony for a "limited" purpose occurred.

Fourth, even if the admission of this testimony was error, it was harmless beyond a reasonable doubt. See Thomas v. State, 993 So. 2d 105, 108-09 (Fla. 1st DCA 2008) (noting that the admission of hearsay evidence is harmless error when there is no reasonable possibility that the evidence contributed to the defendant's conviction); see also Torres-Arboledo v. State, 524 So. 2d 403, 408 (Fla. 1988) (holding that the erroneous introduction of hearsay is harmless error in a criminal case when the

-13-

wrongfully admitted statement is cumulative to other properly admitted evidence); Boykin v. State, 601 So. 2d 1312, 1314 (Fla. 4th DCA 1992) (ruling that the admission of an out-of-court statement could not have been harmful error because the statement was only "a brief moment in the trial," there was similar evidence admitted without objection, and other evidence directly tied the defendant to the crime); Barnes v. State, 470 So. 2d 851, 852 (Fla. 1st DCA 1985) ("Given the substantial evidence establishing Barnes' guilt, and the brief and abbreviated nature of the challenged hearsay, we find that the officer's references to the anonymous phone call were harmless error."). Accordingly, I would affirm Kaseta's conviction.

Finally, the majority opinion sets forth in considerable detail its sundry conclusions that much of the testimony at issue was "dubious," "bizarre," "far-fetched," "doubtful," and that there was a "paucity of evidence." In my view, these were conclusions for the jury to make or not as it saw fit. See Russ v. City of Jacksonville, 734 So. 2d 508, 511 (Fla. 1st DCA 1999) (reaffirming that "the credibility, bias or prejudice of witnesses who testify in a case, as well as the weight to be given their testimony, are a matter for the consideration of and determination by the jury"); Rodriguez v. State, 436 So. 2d 219, 220 (Fla. 3d DCA 1983) (noting that the jury, and not the trial court or the appellate court, has the sole responsibility "to assess the credibility of witnesses. We are precluded by law from re-weighing the evidence on appeal and substituting our judgment for that of the trier of fact"); Bowles v. State, 381 So. 2d 326, 328 (Fla. 5th DCA 1980) ("No legal principle is more firmly established in our system of jurisprudence than that which makes the jury the sole arbiter of the

-14-

credibility of witnesses, including the reasonableness, probability and credibility of a defendant."); see also State v. Law, 559 So. 2d 187, 189 (Fla. 1989) (holding that once the State presents sufficient competent evidence from which the jury could infer guilt to the exclusion of all other inferences in a circumstantial evidence case, it is up to the jury to weigh the evidence and determine whether the State's evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt).  In fact, defense counsel capably cross-examined all of the witnesses on the credibility issues raised by the majority and argued in closing the weight to be given to each witness's testimony.  And if one were able to obtain a transcript of the jury deliberations in this case, I dare say it would in nowise resemble portions of the majority's factual dissertation and analysis which might have occurred with a different jury.  But we are not permitted to now reweigh credibility or conclusions a jury may have implicitly made in performing its fact-finding function.  See Crain v. State, 894 So. 2d 59, 71 (Fla. 2004) ("A reviewing court must assess the record evidence for its sufficiency only, not its weight." (emphasis added)).  Therefore, Kaseta's conviction should stand.